**STATE ex rel. NORANDA ALUMINUM, INC., and Missouri Office of the Public Counsel, Relators–Appellants/Respondents,**

v.

**PUBLIC SERVICE COMMISSION OF the STATE of Missouri, and Union Electric Company, d/b/a AmerenUE, Respondents–Respondents/Cross–Appellants.**

Nos. SD 30865, SD 30888, SD 30890, SD 30892.

Missouri Court of Appeals, Southern District, Division One.

Nov. 7, 2011.

Rehearing Denied Nov. 29, 2011.

Application for Transfer Denied Jan. 31, 2012.

Edward F. Downey, Jefferson City, MO, for Appellant/Respondent Noranda Aluminum.

Lewis R. Mills, Jr., Jefferson City, MO. for Appellant/Respondent Missouri Office of the Public Counsel.

Jennifer Heintz, Jefferson City, MO, for Respondent/Cross–Appellant Missouri Public Service Commission.

James B. Lowery, Columbia, MO, for Respondent/Cross–Appellant Union Electric Company d/b/a/ AmerenUE.

DON E. BURRELL, Presiding Judge.

Noranda Aluminum, Inc. ("Noranda") and the Missouri Office of the Public Counsel ("Public Counsel") appeal an order of the Missouri Public Service Commission ("the Commission") allowing Union Electric Company d/b/a AmerenUE ("AmerenUE") to increase annual revenue collected from its Missouri customers by approximately $161.71 million. Although the order was first challenged in the circuit court—which reversed the Commission's order—on appeal to this court, we review the decision of the Commission, not that of the circuit court.[1] *State ex rel. Missouri Gas Energy v. Public Serv.*

*Comm'n,* 210 S.W.3d 330, 334 (Mo.App. W.D.2006).

In a joint brief, Noranda and Public Counsel ("Appellants") present five points challenging the Commission's findings and rulings as to: 1) the common equity component of AmerenUE's capital structure; 2) the appropriate return on equity ("ROE") for AmerenUE investors; 3) the recovery of excess depreciation for AmerenUE's Callaway nuclear plant ("Callaway"); 4) the fuel adjustment clause ("FAC") permitting AmerenUE to pass on 95% of its changes in fuel costs to its customers; and 5) the treatment of increased vegetation management and infrastructure inspection expenses ("vegetation/infrastructure expenses") incurred by AmerenUE.

Because the Commission acted within its lawful authority and its findings contested on appeal were just and reasonable, we affirm the order of the Commission.

## Standard of Review

We review the Commission's decision to determine whether it was lawful and reasonable. *Missouri Gas Energy,* 210 S.W.3d at 334. The order is considered lawful if the Commission acted within the language of the relevant statute. *Id.* The order is considered reasonable "if it is supported by substantial and competent evidence on the record as a whole." *Id.* We presume the Commission's order valid; the challenging party must prove its inval-

---

1. AmerenUE filed the first notice of appeal from the circuit court judgment. Thereafter notices of appeal were filed by Staff for the Commission ("Commission Staff"), Noranda, and Public Counsel. We ordered that Noranda and Public Counsel be designated as appellants/respondents and the Commission and AmerenUE be designated as respondents/cross-appellants. AmerenUE and Commission Staff present no points on appeal challenging the Commission's order. Ameren-

UE offers a separate point responding to Appellants' request in its conclusion to direct that the amounts paid in the registry of the circuit court be disbursed to Noranda, but because of the resolution of the other issues in this case, we do not decide that point. Effective July 1, 2011, sections 386.510 and 386.540 were amended to allow parties to now appeal an order of the Commission directly to the appellate court without first going through the circuit court.

idity. *State ex rel. Missouri Office of Pub. Counsel v. Public Serv. Comm'n of the State of Missouri*, 293 S.W.3d 63, 69 (Mo. App. S.D.2009). In a rate case where the increase was suspended pending hearing, we view the evidence in the light most favorable to the Commission. *Id.* The Commission is also afforded the benefit of reasonable inferences that may be drawn from the facts. *State ex rel. Associated Nat. Gas Co. v. Public Serv. Comm'n of the State of Missouri.*, 37 S.W.3d 287, 292 (Mo.App. W.D.2000). The Commission's rulings on questions of law are reviewed *de novo, Environmental Utilities, LLC v. Public Serv. Comm'n*, 219 S.W.3d 256, 263 (Mo.App. W.D.2007), but we defer to the Commission all determinations of witness credibility. *Public Counsel*, 293 S.W.3d at 69. If substantial evidence supports either of two conflicting factual propositions, we are bound by the Commission's resolution of that conflict. *Id.* at 80. "It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside." *State ex rel. Missouri Gas Energy v. Public Serv. Comm'n*, 186 S.W.3d 376, 382 (Mo. App. W.D.2005).

## Factual and Procedural Background

AmerenUE is a utility company that provides electric service to significant portions of Missouri. In April 2008, AmerenUE filed tariff sheets with the Commission seeking an annual revenue increase of $251 million to commence in May 2008, and the Commission suspended the tariff sheets until March 2009 in order to permit public notice and an opportunity for interested parties to intervene. Public Counsel (on behalf of the public pursuant to section 386.710 [2]), Noranda, and certain other parties were permitted to intervene.[3] Noranda is an industrial customer of AmerenUE that requires a significant level of electrical service to produce 571 million pounds of aluminum each year.

Public hearings were held, and the parties were allowed to file transcripts of direct, rebuttal, and surrebuttal testimony in advance of the evidentiary hearing. The evidentiary hearing was held on multiple dates in November and December, 2008. The Commission issued its findings, conclusions of law, and order on January 27, 2009.[4] The circuit court reversed the Commission's order, remanded the case to "the [Commission] for further action[,]" and, by separate order, suspended judgment such that the funds payable by Noranda pursuant to the Commission's order would continue to accrue and be impounded in the registry of the circuit court pend-

**2.** All statutory references are to RSMo 2000 unless otherwise stated.

**3.** Additional parties that intervened, but did not appeal, were: The International Brotherhood of Electrical Workers Locals 2, 309, 649, 702, 1439, and 1455; AFL–CIO and International Union of Operating Engineers Local 148 AFL–CIO; The Missouri Industrial Energy Consumers ("MIEC" comprised of Anheuser–Busch Companies, Inc.; BioKyowa, Inc.; The Boeing Company; Chrysler; Doe Run; Enbridge; Explorer Pipeline; GKN Aerospace; General Motors Corporation; Hussmann Corporation; JW Aluminum; Monsanto; Pfizer; Precoat Metals; Proctor & Gamble Company; Nestle Purina PetCare; Solutia; and U.S. Silica Company); The Missouri Energy Group ("MEG" comprised of Barnes–Jewish Hospital; Buzzi Unicem USA, Inc.; and SSM HealthCare); The Missouri Department of Natural Resources; Laclede Gas Company; The Consumers Council of Missouri; AARP; The Commercial Group (comprised of JCPenney Corporation and Wal–Mart Stores East, LP); and Missouri Coalition for the Environment and Missouri Nuclear Weapons Education Fund, d/b/a Missourians for Safe Energy.

**4.** One commissioner wrote a concurring opinion and two commissioners joined in a dissenting opinion.

ing conclusion of the appeal pursuant to its previous stay order.

Not every issue contested before the Commission is being appealed. As a result, the factual summary we present here focuses on the facts relevant to the resolution of Appellants' points.

The Commission stated that its order would permit "AmerenUE to increase the revenue it may collect from its Missouri customers by approximately $162.6 million, based on the data contained in the True-up Reconciliation filed by the [Commission] Staff on January 9, 2009."[5] In its order approving the revised tariff sheets, the Commission stated that the Commission Staff had made a more detailed calculation regarding the increase that would result from the Commission's report and order and found the amount to be "$161,709,205 annually."

The increase was based upon the revenue required by AmerenUE to operate as a regulated electric utility. The parties agreed on the formula that should be used to determine the revenue required by AmerenUE. That formula included consideration of operating expenses, depreciation on the plant, taxes, and an appropriate return on the utility's investment.[6] The figures for a revenue requirement are generally "based on the costs and income the company experienced during a historical test year." AmerenUE's "test year" was "the 12–month period ending March 31, 2008, with certain pro forma adjustments through September 30, 2008, trued-up as of September 30, 2008."

### 1. Capital Structure

Although they agreed on the elements of the required revenue formula, the parties disagreed on what amounts should be included in those elements. For instance, the return requirement addresses AmerenUE's costs to obtain capital such as "generating plants, electric meters, wires and poles, and the trucks driven by AmerenUE's repair crews." A senior capital markets specialist for Ameren Services Company, Michael O'Bryan, testified that AmerenUE's capital consists of long and short term debt, preferred stock, and common equity. The parties do not dispute the costs for AmerenUE's short and long-term debt or preferred stock, and they agree that any figure used for common equity should not include unregulated earnings.

For purposes of calculating the cost—or rate of return to investors—for common equity, O'Bryan stated in his April 2008 pre-filed, direct testimony that he was using for his initial testimony data from a twelve-month period that ended on December 31, 2007. He then testified that he planned on supplementing his "testimony with updated schedules to reflect the test year period ending March 31, 2008 when

5. The "true-up" process for this case is not defined by the parties with any citations to the record. It is described in AmerenUE's brief as "effectively updat[ing] the March 31, 2008 figures for material items for which known and measurable changes occurred, to reflect values as of September 30, 2008. This allows more current information to be used in estimating the revenue requirement used to set prospective rates."

6. The precise formula is expressed as follows:

Revenue Requirement $= E + D + T + R(V{-}AD + A)$

Where: $E$ = Operating expense requirement

$D$ = Depreciation on plant in rate base

$T$ = Taxes[,] including income tax related to return

$R$ = Return requirement

$(V{-}AD + A)$ = Rate base

For the rate base calculation:

$V$ = Gross Plant

$AD$ = Accumulated depreciation

$A$ = Other rate base items

the data is available." O'Bryan testified that his December 31, 2007, figure for common equity was "adjusted to remove the effects of its investment in its wholly-owned subsidiary, Union Electric Development Corporation." He noted that as of January 1, 2008, this entity "was no longer a subsidiary of AmerenUE[.]" He also adjusted the common stock's book value to remove the company's "total other comprehensive income as well as the Company's investment in Electric Energy, Inc." After these adjustments, O'Bryan calculated AmerenUE's percentage of common equity to be 51.119%.

O'Bryan testified in "supplemental direct testimony" in June 2008 that he had updated his data to reflect the twelve-month period ending on March 31, 2008, in accord with the test year specified by the Commission. Once again, O'Bryan adjusted the figure "to remove the effects of [AmerenUE's] investments in its formerly wholly-owned subsidiaries, Union Electric Development Corporation and Electric Energy, Inc. As of March 31, 2008, these subsidiaries are no longer owned by AmerenUE." He also "remov[ed] AmerenUE's total other comprehensive income." After adjusting the dates used for the twelve-month period and removing the stated elements, O'Bryan determined that common equity accounted for 50.928% of AmerenUE's capital structure.

In his October 2008 rebuttal testimony, O'Bryan made "a correction to reverse an incorrect adjustment that was a part of AmerenUE's March 31, 2008 common equity balance that [he] submitted in [his] supplemental direct testimony in June 2008." O'Bryan responded as follows to questions regarding his correction.

Q. Please explain the correction you are making to AmerenUE's common equity balance.

A. When I prepared my supplemental direct testimony I incorrectly made an adjustment to AmerenUE's common equity balance. The adjustment of ($145,181,525) was to account for Undistributed Earnings of Subsidiaries ("UES") of AmerenUE. This total UES balance has historically been subtracted from AmerenUE's common equity balance to remove any earnings related to unregulated subsidiaries. This adjustment is made to insure that unregulated earnings do not impact [AmerenUE's] regulated capital structure.

Q. Why was it incorrect to make such an adjustment to AmerenUE's common equity in this case?

A. AmerenUE's total UES balance prior to the end of the first quarter of 2008 contained the undistributed earnings of its wholly-owned unregulated subsidiaries. As I stated in my supplemental direct testimony these subsidiaries are no longer owned by AmerenUE. Subsequent to the date my supplemental direct testimony was filed, the AmerenUE UES month-end March 2008 accounts were corrected to a zero balance. Therefore, given the correction to the account balances, the adjustment contained in my supplemental direct testimony is no longer appropriate.

Q. What is the net effect of this correction?

A. The net effect of the correction is that it raises the Company's common equity balance to $3,428,579,662 (52%) from $3,283,398,137 (51%). The corrected weighted average cost of capital is shown in Schedule MGO–RE1.

At the hearing before the Commission, O'Bryan responded as follows to a Commissioner's question.

> [Commissioner]: Just one quick question. I just wanted to make sure that I'm understanding this correctly. You are proposing AmerenUE's actual capital structure as of December 31st, 2007?
>
> [O'Bryan]: It was updated in my supplemental direct to March 31st, 2008.
>
> [Commissioner]: But you're proposing that the [sic] actual capital structure?
>
> [O'Bryan]: Yes.

The projected impact of increasing the proportion of common equity in AmerenUE's capital structure would be to raise AmerenUE's revenue requirement by $7.6 million according to another AmerenUE witness, manager of regulatory account, Gary Weiss.

A financial consultant, Stephen Hill, testified for the Commission's Staff that O'Bryan "inappropriately added back approximately $145 million of retained earnings of unregulated subsidiaries no longer owned by AmerenUE, after having correctly removed those same amounts in both his original [d]irect and [s]upplemental [t]estimonies." Hill stated that "[O'Bryan's] testimony indicates that the unregulated retained earnings balances were originally included in AmerenUE's March 2008 common equity balances." Hill reasoned that AmerenUE's "after-the-fact" accounting adjustment simply brought the account "in agreement with the amount [O'Bryan] used to determine his originally-recommended ratemaking common equity ratio of 51%, because both common equity balances excluded the unregulated common equity."

In August 2008, a public utility regulation consultant offered by MIEC, Michael Gorman, testified that he used the 50.928%

figure for his evaluation purposes and he recommended no adjustments to O'Bryan's first schedule.

In resolving the conflicting testimony, the Commission found "O'Bryan's representations to be more credible than the theory offered by Hill" and "the Commission [found] that the correct capital structure is that described by O'Bryan in his rebuttal testimony." That structure included 52.009%) of common equity.

### 2. ROE

Gorman explained that common equity investors expect to make a return on their investment in a company. What actual ROE AmerenUE should be permitted to receive was disputed. Maurice Brubaker, a public utility regulation consultant testified on behalf of MIEC, that "[e]ach ten basis points (one-tenth of a percentage point) in ROE equals a revenue requirement of approximately $5 million." The Commission stated that it "cannot simply find a rate of [ROE] that is unassailably scientifically, mathematically, or legally correct. Such a 'correct' rate does not exist."

Gorman and other expert witnesses testified regarding their recommendations of an appropriate ROE based upon various methods they used to estimate a fair return. Gorman testified that a return of 9.95 to 10% may be reasonable if a FAC is also permitted for the company to pass on some of its changes in fuel costs to customers and that 10.2 % would be an appropriate ROE in the absence of such a clause. A finance professor, Dr. Roger A. Morin, testified on behalf of AmerenUE that it should be allowed a ROE of 10.9% if a FAC is allowed and 11.15% if no FAC is included. A public utility regulation consultant, Billie Sue LaConte, testified for MEG that the respective ROE with a FAC should be 10% and 10.2% if no FAC is

included. Hill testified for the Commission's Staff that 9.375 % should be allowed as a ROE if a FAC is included and 9.5%) in the absence of such a clause.

In resolving the dispute, the Commission noted that, except for Hill, the experts were within 70 basis points (.7) of one another and "within 50 basis points of the reported average ROE for either vertically-integrated utilities or all utilities." In reviewing Gorman's methodology, the Commission applied a different long-term growth estimate from a published source and adjusted the average result to reflect AmerenUE's particular market rating, risk status, quarterly dividend payment schedule, and most-recent historical equity risk premium. These changes produced a ROE of 10.76%).

The Commission adjusted Morin's analysis to remove "costs [ ] associated with stock issues" because AmerenUE had not experienced any such issues during the test year. The Commission also adjusted Morin's figures to account for the quarterly dividend payment schedule used by AmerenUE. The resulting rate on return was 10.8%. The Commission did not find LaConte's testimony to be persuasive as it "did not provide quite the same detailed analysis as either [Morin or Gorman]." The Commission did not credit Hill's recommendation because it "would give AmerenUE the lowest ROE authorized for any integrated electric utility in the country for 2008." In addition to considering the various methods the experts used to reach their respective percentage recommendations, the Commission also considered data from "Regulatory Research Associates." Based on this information, the Commission found that "[f]or the first nine months of 2008, the average ROE awarded to electric utilities in this country was 10.51 percent[.]" This was an increase over the 10.36% average reported for the year 2007. Further, when less "risky" "wires only" utilities were removed and the numbers considered "for integrated utilities, such as AmerenUE," the number was at least 10.62% with a higher figure of 10.71%) for "Midwest integrated electric utilities." [7]

The Commission stated it referenced these averages

> not because the Commission should, or would slavishly follow the national average in awarding a [ROE] to AmerenUE. However, AmerenUE must compete with other utilities all over the country for the same capital. Therefore, the average allowed [ROE] provides a reasonableness test for the recommendations offered by the [ROE] experts.

The Commission further found that although a FAC would be allowed, that allowance did not necessarily require a downward adjustment of the ROE. The Commission stated that "most of the companies included in the proxy groups used by the analysts to estimate an appropriate [ROE] for AmerenUE already operate under a [FAC]." The Commission found that a ROE of 10.76 was "fair and reasonable" and would "allow AmerenUE to compete in the capital market for the funds needed to maintain its financial health."

### 3. The 95% FAC

Because a FAC can address significant, fully uncontrollable and volatile fuel costs

---

7. The Commission noted:

"Integrated" or "vertically-integrated" is an industry-specific term commonly used to refer to utilities that own their own generation, transmission and distribution system. An electric utility that only owns a distribution system or possibly owns some transmission in connection with a distribution system is commonly referred to as a "wires only" company.

and AmerenUE must compete for investors while also coping with the effects of "regulatory lag," the Commission decided that a FAC was warranted. In terms of how fuel costs should be passed on to ratepayers, the Commission noted that AmerenUE sought the same "incentive mechanism" established for two other companies in recent rate cases where FACs were approved so that AmerenUE would still absorb 5% of any "under recovery balance[.]" The remaining 95% could be passed on to customers. The provision also works the other way, such that a price-drop is also passed on to customers.

Brubaker testified in favor of passing along 80% of fuel costs to customers and requiring AmerenUE to absorb the other 20%, including a .5% cap on the amount it could pass on to its shareholders. A public policy consultant, Martin Cohen, testified on behalf of the State of Missouri. He also recommended an 80/20 provision or, alternatively, a provision that would permit AmerenUE to pass along 85% of cost increases to its customers but requiring that those customers receive a 95% benefit of any cost decreases. Chief Utility Economist for Public Counsel, Ryan Kind, testified in favor of a 50% pass-through. Noranda did not offer testimony as to a particular provision but took the position that a sharing mechanism between 75 and 90% would be appropriate. Most FACs used throughout the nation do not require the utility to absorb some of the fluctuating costs and instead pass on 100% of fuel changes to ratepayers.

The Commission found that Brubaker and Cohen's 80% provision was more reasonable than Public Counsel's 50% provision, but that even the former "proposals would still impose more costs on AmerenUE than is necessary to provide an appropriate incentive." The Commission found that "[a] 95 percent pass through provides

AmerenUE sufficient incentive to operate at optimal efficiency because the company already has several incentives in place that encourage it to minimize net fuel costs." Three incentives cited by the Commission came from AmerenUE's chief accounting officer, who testified that: 1) AmerenUE purchased coal through an affiliated company that was also under financial pressure to minimize costs; 2) the utility used financial performance incentives for employees to minimize fuel costs; and 3) the utility must work on its own to control costs because ultimately FACs are limited by reliance on historical costs and by the uncertainty of future regulatory actions. The FAC approved by the Commission included a detailed heat rate/efficiency testing plan intended to "guard against imprudent operation and maintenance of the company's generating units, thus controlling net fuel costs." The Commission stated that "[i]f AmerenUE does not efficiently control its net fuel costs, the Commission could reconsider the [FAC]" in AmerenUE's next rate case.

The Commission also stated:

There is one additional consideration that supports the implementation of a 95 percent pass through provision in AmerenUE's [FAC]. That is the likely impact the pass through provision will have on AmerenUE credit worthiness in the eyes of Wall Street. The Commission has recently allowed two other Missouri electric utilities, Aquila and Empire, to implement a [FAC] including a 95 percent pass through provision. To now impose a less favorable pass through provision on AmerenUE would signal investors that AmerenUE was less well regarded by this regulatory agency. When asked specifically about the 80 percent pass through proposal offered by MIEC, AmerenUE's witness, Wall Street investment banker, [ ] Rygh, said

he would not be comfortable with that proposal because "the markets are looking for bad news ... that would be a fairly tough thing for them to swallow." (Footnotes omitted.) The absence of a FAC contributed to a lower investment grade rating for AmerenUE issued by Moody's Investor Services, according to the testimony of Gary Rygh, a Senior Vice President at Barclays Capital, Inc. Rygh testified that "[t]he lack of inclusion of a reasonable FAC will continue to keep AmerenUE in the minority of its peers who have these procedures in place and will also be going to the market to raise capital." The President and Chief Executive Officer of AmerenUE, Thomas Voss, testified that AmerenUE has been unable to actually earn the 10.2% rate of return authorized in the last rate case and has instead earned a 9.31% ROE.

### 4. Depreciation Rate for Callaway

Depreciation is also addressed in required revenue so that "a utility is able to recover the cost of its investment in its rate base by recognizing the reduction in value of that property over the estimated useful life of the property." A calculation of depreciation depends upon the assumed life of the property in a given class. The depreciation rates for AmerenUE in its last rate case were based on "[a] complete depreciation study" which "requires an actuarial analysis of the complete mortality records of all plant account assets owned by the company."

A utility regulatory consultant, William Dunkel, testified on behalf of Public Counsel that there was "a major problem with the Callaway [ ] plant depreciation rates that AmerenUE used in its filing" and that those depreciation rates over-depreciated AmerenUE's capital by a total of $242,736,877. Dunkel testified AmerenUE's depreciation expense should be "$7,063,093 less per year than results from

the depreciation rates AmerenUE is using[.]" Dunkel testified that Callaway's assumed plant life changed from 40 to 60 years after AmerenUE sought a 20–year extension of its nuclear permit. Callaway had been depreciated faster, or at a higher rate, under the former 40–year assumption. Dunkel testified that now that the depreciation rates had changed, the higher amounts previously credited toward actual book depreciation reserve were not addressed in AmerenUE's theoretical reserve, which assumed a 60–year plant life.

A utility regulatory engineer for Commission Staff, Guy Gilbert, testified that current depreciation rates had only been in place since June 1, 2007. Even at the time of the 2007 rate case, the parties were aware of a difference between the theoretical reserve method used by AmerenUE and the actual book reserve method. Public Counsel did not recommend an adjustment in the 2007 case, despite the difference between theoretical and book reserve methods, and it was decided that the situation should be monitored "for possible correction in a future depreciation study."

Gilbert acknowledged that while the annual difference of $7,063,093 in the depreciation for Callaway "is material in itself from a stand-alone rate case adjustment perspective, it amounts to much less than what is even remotely close to a significant minority of the total annual accrual amount." He further cautioned that

a change in depreciation accrual of this magnitude should only be made in the context of a complete depreciation study when the over or under accrual of the depreciation reserve can be examined for all of the plant accounts. The Staff does not believe a change in depreciation rates for one type of plant that results in a reduction of $7 million out of an annual depreciation accrual of over $300 million

for all plant accounts is appropriate without the full review that occurs during a complete depreciation study.

Gilbert testified that Callaway represented "only about 23%" of "[t]he total amount of plant in service" and therefore "[did] not yield a complete picture of [AmerenUE's] net depreciation requirements."

The Commission found that while a complete depreciation study is required for submission of a general rate increase under 4 CSR 240–3.160,[8] such a study is not required if one was previously submitted to the Commission's Staff within three years of filing the current rate case, and "4 CSR 240–3.175 requires an electric utility to submit a complete depreciation study at least once every five years even if it has not filed a rate case within that time." A depreciation studies project manager for Gannett Fleming, Inc., John Wiedmayer, testified for AmerenUE that the last complete depreciation study conducted by the Commission was done in July 2006, and the next one would not be due until July 2011, unless a new rate case were to be filed after July 2009—which would require a complete study to be done at that time. The Commission acknowledged that the difference between AmerenUE's theoretical and actual book reserve depreciation accounts had grown, but it questioned the reliability of Dunkel's 2005 data in predicting the actual balance between depreciation methods when applied to all accounts and considering all factors for each of those accounts. The Commission declined to change AmerenUE's depreciation rates without a complete study, but directed AmerenUE to provide the complete information it had used in calculating and comparing depreciation rates when it presented its next depreciation study.

### 5. Vegetation/Infrastructure Expenses

After severe storms caused power outages in 2006, the Commission promulgated 4 CSR 240–23.020 and 4 CSR 240–23.030.[9] These regulations set new standards for electric utility companies to use in inspecting their infrastructure and managing vegetation growth that has an impact on the distribution of electricity. The regulations were approved in late 2007, but due to a procedural error by the Commission, they did not take effect until June 30, 2008. The Commission acknowledged in the instant case that "[i]n promulgating the stricter standards, the Commission anticipated utilities would have to spend more money to comply. Therefore, both rules include provisions that allow the utility a means to recover to [sic] the extra costs it incurs to comply with the requirements of the rule."

Appellants do not contest the $54.1 million requested by AmerenUE for vegetation management and $10.7 million for infrastructure inspections, and these amounts were allowed by the Commission. Appellants dispute AmerenUE's recovery of additional amounts spent for vegetation/infrastructure expenses over the amount allotted in its last rate case before the new rules went into effect, the future tracking of additional amounts spent in the gap between rate application and approval, and future expenses over the approved amount of $64.8 million when the new rates are in place.

In its last rate case, AmerenUE was required to spend and allowed to recover $45 million per year on vegetation management. AmerenUE spent an additional $2.9 million for vegetation management and requested that this amount be amor-

---

8. References to regulations are to Mo.Code Regs. Ann. (2010), unless otherwise stated.

9. Mo.Code Regs. Ann. (2008).

tized over three years and recovered through rates set in the instant case. The Vice President of Energy Delivery–Distribution Services for AmerenUE, Ronald Zdellar, testified that AmerenUE began complying with the new rule on January 1, 2008, because it anticipated that the rule would be effective at that time. He also testified that the new rule required more than what AmerenUE had previously committed to do.

The Commission allowed a three-year amortization and recovery of the additional $2.9 million spent on vegetation management. Further, AmerenUE was permitted to account for additional amounts spent between October 1, 2008, and February 28, 2009 (from the end of the "true-up" period and until the commencement of new rates from the instant case), and to defer those costs for future consideration in AmerenUE's next rate case.

AmerenUE initially requested a three-year amortization of $8.6 million to recover expenses for both inspection and repair of its infrastructure from January 1 to September 30, 2008, and authority to track such expenses for the period from "true-up" to commencement of the new rates with the purpose of seeking a recovery of those expenses in a future rate case. That figure was later adjusted downward to $8 million. The Commission granted these requests in regard to inspection costs, but denied any recovery or potential deferral of repair costs to avoid potential double-

counting of repair costs that could not be separated from inspection costs. The Commission noted that because the breakdown between inspection and repair costs was not specified in the corrected figure, it applied the same ratio originally used for the $8.6 million figure ($4.9 million for repairs and $3.7 for inspections) and thereby allowed AmerenUE to amortize $3.44 million in inspection costs over the next three years.

The Commission also allowed AmerenUE to track its vegetation/infrastructure expenses exceeding $64.8 million and submit them for future consideration in its next rate case, but limited consideration of excess expenses to 10% over the $64.8 million base amount. The Commission found that a cap on excess expenses minimized the concern that AmerenUE could spend anything it wanted on vegetation/infrastructure expenses with the expectation of a "likely" recovery. Additionally, the Commission directed that the tracking mechanism follow actual expenditures that total less than the base amount such that under-expenditures result in a regulatory liability. The Commission then stated that under- and over-expenditures will "be netted against each other and shall be considered in AmerenUE's next rate case."

## Analysis

■ Each of Appellants' points challenge, among other things, the reasonableness of the Commission's order.[10] The

---

**10.** Each of Appellants' points run afoul of Rule 84.04(d)(2)(A) by challenging multiple Commission actions in a single point. Point one asserts the Commission erred by: 1) making a finding not supported by substantial evidence; 2) making an unlawful finding; and 3) abusing its discretion in shifting the burden of proof. Point two asserts the Commission erred by: 1) unreasonably including a particular growth model; 2) relying on evidence from another case; 3) adjusting a calculation without competent and substantial evidence; 4) selectively adopting portions of expert testimony; and 5) failing to adjust downward based upon the presence of a F AC, all in determining the appropriate ROE. Point three contends the Commission erred by: 1) unlawfully, unjustly and unreasonably permitting an over-recovery of depreciation; permitting an over-recovery of depreciation not supported by competent and substantial evidence, and abusing its discretion in permit-

Commission is empowered under section 393.140.5 to "determine and prescribe the just and reasonable rates and charges[.]" In reviewing each of these reasonableness-based challenges, "we are guided by the seminal United States Supreme Court decisions in [*Federal Power Commission v.*] *Hope* [*Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944)], and *Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923)[ ]." *State ex rel. Missouri Gas Energy v. Public Serv. Comm'n,* 186 S.W.3d 376, 384 (Mo.App. W.D.2005).

■ In *Hope,* which, concerned rate-making under the Natural Gas Act of 1938, the United States Supreme Court stated:

> [The Federal Power Commission's] rate-making function, moreover, involves the making of 'pragmatic adjustments.' And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.

> The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

*Hope,* 320 U.S. at 602, 64 S.Ct. 281 (citations omitted; single quotations used as in original).

In discussing what is "just and reasonable" in *Bluefield,* the Supreme Court stated:

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding, risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to

ting an over-recovery of depreciation. Point four makes the same three claims asserted in point three except that they are directed against the Commission's authorization of a FAC. Point five alleges the Commission erred by: 1) permitting amortized recovery of past vegetation/infrastructure expenses; 2) permitting deferral of a five-month period of such expenses for future recovery; and 3) instituting a tracking mechanism because these things are unlawful and unreasonable. "Points containing multifarious allegations of error do not comply with Rule 84.04." *Dixon v. Thompson,* 235 S.W.3d 568, 571 (Mo.App. S.D.2007). They "arguably preserve[ ] noth-

ing for appellate review." *Chipperfield v. Missouri Air Conservation Comm'n,* 229 S.W.3d 226, 235 n. 10 (Mo.App. S.D.2007). Such points are particularly problematic when they blend multiple allegations of error involving both law and fact. Yet, we do have discretion to consider the points, *Dixon,* 235 S.W.3d at 571, and are mindful of the significant interests at stake, including those of the public. We will therefore consider the merits of the errors alleged as best we understand them. *State ex rel. Oliver v. Public Serv. Comm'n,* 542 S.W.2d 595, 597 (Mo.App. K.C.D.1976); *Chipperfield,* 229 S.W.3d at 235 n. 10.

assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

262 U.S. at 692–93, 43 S.Ct. 675. Further, with "[n]o methodology being statutorily prescribed, and ratemaking being an inexact science, requiring use of different formulas, the Commission may use different approaches in different cases." *State ex rel. Arkansas Power & Light Co. v. Missouri Pub. Serv. Comm'n,* 736 S.W.2d 457, 462 (Mo.App. W.D.1987).

Appellants acknowledge that *Hope* and *Bluefield* set general standards for a fair ROE, but they contend that the language in *Hope* suggesting that judicial review of return of equity decisions is limited "is inconsistent with the standard of review applicable to review of a [Commission] decision by a Missouri court." They cite the statement in *State ex rel. GTE North, Inc. & MCI Telecomnt, Corp. v. Missouri Pub. Serv. Comm'n,* 835 S.W.2d 356, 370 (Mo. App. W.D.1992), that "[t]he Commission does not, however, have unfettered discretion in makings its determination; there are judicial limits."

But *GTE North* does not supplant *Hope.* As Commission Staff points out, *GTE North* was a telephone case where a rate of ROE was not at issue (the quotation was stated in the context of a challenge over the test period to be used for determining expenses) and it does not discuss either *Hope* or *Bluefield.* More importantly, the Western District's statement was immediately followed by: "For judicial review to have any bearing, there is a minimum requirement that the evidence, as explained by the witnesses and the Commission, make sense to the reviewing court. On appeal, the court may not approve an order simply on faith in the Commission's expertise." *Id.* (citation omitted). These statements do not contradict *Hope*'s requirement that a rate challenger must make a convincing showing that the rate is unjust and unreasonable in its consequences. 320 U.S. at 602, 64 S.Ct. 281.

Appellants also quote *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), as recognizing that the criteria in *Hope* for reviewing rate orders "remain pertinent, but they scarcely exhaust the relevant considerations." *Id.* at 791, 88 S.Ct. 1344. Appellants focus on one of the criterion from *Permian Basin* that "the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence." *Id.* at 791–92, 88 S.Ct. 1344. Appellants distill from this that "the Court recognized that the Federal Power Commission, like the [Commission here], has discretion to choose the methods of regulation, but the manner in which it employs these methods is subject to the court's review."

In *Permian Basin,* the Court reviewed Federal Power Commission decisions regarding maximum natural gas rates for multiple independent producers grouped geographically for purposes of area regulation instead of addressing rates set by a single producer as in *Hope. Id.* at 768, 88 S.Ct. 1344. The Court stated that while the *Hope* criteria could be "suitably modified[,]" it did not exhaust relevant considerations for review of area regulation cases. *Id.* at 791, 88 S.Ct. 1344. Indeed,

the Court cited *Hope* in stating the applicable scope of review:

> A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' *FPC v. Hope Natural Gas Co., supra,* 320 U.S., at 602 [64 S.Ct. 281]. We are not obliged to examine each detail of the Commission's decision; if the 'total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.' *Ibid.*
>
> Moreover, this Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.' *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585[ 62 S.Ct. 736, 86 L.Ed. 1037 (1942) ].

*Id.* at 767, 88 S.Ct. 1344. *Permian Basin* did not alter the guidance *Hope* and *Bluefield* give us in reviewing the instant case. We still review the Commission's decision for lawfulness and reasonableness, and our review includes the requirement that the decision be supported by substantial and competent evidence on the whole record. *Missouri Gas Energy,* 210 S.W.3d at 334. A rate that is supported by such evidence and is within the "zone of reasonableness" will not be set aside. *Permian Basin,* 390 U.S. at 797, 88 S.Ct. 1344. For ease of analysis, we will first consider points one, two, and four as they address closely related issues regarding ROE, then address points three and five.

## Point I: Percentage of Common Equity in Capital Structure

Appellants' first point contends the Commission erred in finding that the percentage of common equity in AmerenUE's capital structure was 52.009 instead of 50.928 because the "finding is not supported by competent and substantial evidence, is unlawful, unreasonable, arbitrary and capricious and an abuse of discretion, because in reaching this conclusion, the [Commission] unlawfully shifted the burden of proof to the parties opposing AmerenUE's rate increase and the only competent and substantial evidence" favors the lesser percentage. The main focus of Appellants' point, as illuminated in their argument, is a claim that the testimony of O'Bryan is insufficient to support a determination that common equity comprised 52.009% of AmerenUE's capital structure for purposes of determining its rate base and that it was not Appellants' burden to disprove the percentage requested by AmerenUE.

O'Bryan changed his opinion of the percentage of common equity from 50.928 to 52.009%) as the case progressed. Appellants argue that "[a]t least two other experts in the case" utilized O'Bryan's original percentage of 50.928 for common equity, pointing to the testimony of Gorman and Hill. Gorman testified that he assessed a rate of ROE as a consultant for MIEC by simply repeating the capital structure figures first stated by O'Bryan and recommended that no adjustments be made to that original figure. Gorman testified in August 2008—before O'Bryan changed his figure in October 2008—and Appellants point to no testimony by Gorman suggesting that he would have disagreed with O'Bryan's revised figure.

Hill criticized O'Bryan's revision as unnecessary because he reasoned that when AmerenUE changed the balance for un-

regulated earnings, this revision "would have brought the newly-changed book amount of AmerenUE common equity in agreement with the amount [O'Bryan] used to determine his originally-recommended ratemaking common equity ratio of 51%, because both common equity balances excluded the unregulated common equity." As the Commission Staff described Hill's position, he essentially "contend[ed] that if the retained earnings of unregulated subsidiaries were not removed from the account until after [O'Bryan] filed his supplemental direct testimony, they must have still been in the account when [O'Bryan] originally calculated the capital structure contained in his supplemental direct testimony and [O'Bryan's] later adjustment was unnecessary."

Appellants assert that the Commission "turn[ed] the burden of proof on its head" by accepting O'Bryan's revised figure and faulting Hill for not disproving O'Bryan's statements. Appellants cast their argument as challenging the sufficiency of the evidence and cite *State ex rel. Pub. Counsel v. Missouri Pub. Serv. Comm'n*, 289 S.W.3d 240 (Mo.App. W.D.2009) as supporting the reversal of a Commission order "[w]here [the witness] testified that certain costs are the same for each customer regardless of usage but failed to take all costs into account," and therefore the testimony "[did] not constitute competent and substantial evidence upon which the Commission could find that the cost to serve all residential customers is the same." *Id.* at 250. Appellants assert that "[t]he lack of any factual basis in O'Bryan's [r]ebuttal [t]estimony renders it wholly incompetent to support his revised capital structure percentages." As AmerenUE points out, *Public Counsel* involved a failure by the witness to consider relevant facts in formulating an opinion. Here, Appellants do not argue that O'Bryan failed to consider the relevant facts.

Appellants concede that "O'Bryan may have been a credible witness[,]" but insist in their reply brief that O'Bryan's testimony was not "'competent and substantial evidence'—that is, evidence that is probative of the issue it was offered to prove[,]" citing *Gregory v. Detroit Tool & Eng'g*, 266 S.W.3d 844, 846 (Mo.App. S.D. 2008). In *Gregory*, a worker's compensation claimant acknowledged that a witness was competent but at the same time contended that the witness's opinions were not substantial. *Id.* at 846 n. 3. We noted in *Gregory* that "'[s]ubstantial' does not necessarily mean quantity or even quality, it simply means that the evidence relied on must be probative of the issues it was offered to prove." *Id.* (quoting *Banther v. Drew*, 171 S.W.3d 119, 124–25 (Mo.App. S.D.2005)). Competent evidence is relevant, admissible evidence that is capable of establishing a pertinent fact. *Missouri Real Estate Appraisers Comm'n v. Funk*, 306 S.W.3d 101, 106 (Mo.App. W.D.2010).

Appellants do not claim that O'Bryan's testimony was inadmissible or that it was irrelevant. The real gravamen of Appellants' complaint is that the Commission should not have been persuaded by O'Bryan's revised testimony. O'Bryan's rebuttal testimony was that AmerenUE's percentage of common equity was 52.009, and he gave his reasons for using this figure. Although his examiners failed to elicit a helpful explanation from O'Bryan of his thought processes regarding his initial mistake in adjusting the figure for common equity, O'Bryan's testimony was nonetheless probative of the capital structure of AmerenUE. *See Gregory*, 266 S.W.3d at 846 n. 3.

The Commission stated that it found "O'Bryan's representations to be more credible than the theory offered by Hill." As the fact-finder, the Commission was

entitled to make such a determination. *Public Counsel,* 293 S.W.3d at 69. The Commission did not find 52.009% to be the correct common equity figure because Hill had failed to carry any burden of proof on the issue for Appellants. As the Commission explained, it simply accepted O'Bryan's testimony in support of 52.009%) as credible in spite of Hill's criticism of it.

■■■ Appellants contend that facts not in evidence must be assumed in order to find that 52.009%) is the appropriate common equity figure. On the contrary, the Commission was permitted to draw reasonable inferences from O'Bryan's testimony and we view the evidence and inferences from it in the light most favorable to the Commission's finding. *See Id.; Associated Nat. Gas Co.,* 37 S.W.3d at 292. O'Bryan testified in his supplemental direct testimony that "[a]s of March 31, 2008, these subsidiaries are no longer owned by AmerenUE." In his original testimony, O'Bryan knew that as of January 1, 2008, Union Electric Development Corporation "was no longer a subsidiary of AmerenUE[.]" Yet, as O'Bryan explained in his rebuttal testimony, "This total UES [undistributed earnings of subsidiaries] balance has historically been subtracted from AmerenUE's common equity balance to remove any earnings related to unregulated subsidiaries. This adjustment is made to insure that unregulated earnings do not impact the Company's regulated capital structure."

We cannot say that it was unreasonable to conclude that O'Bryan recognized that he should not have subtracted an amount for unregulated subsidiaries (even though he knew that no such entities were still owned by AmerenUE as of March 2008) when he saw that the undistributed earnings of the subsidiaries account was changed to a zero balance.[11] While Hill assumed that "the unregulated retained earnings balances were originally included in AmerenUE's March 2008 common equity balances[,]" as used by O'Bryan in his calculations for his supplemental direct testimony, the Commission was not required to accept that assumption as true and was permitted to choose between competing views of the inferences to be drawn from the facts. *See Public Counsel,* 293 S.W.3d at 80. The Commission was entitled to believe O'Bryan when he testified that he should not have made the subtraction he made for his supplemental direct testimony. It was then entitled to infer from that testimony "the likelihood that O'Bryan in fact used the corrected account balance when he reported the revised capital structure in his rebuttal testimony, even though he does not report that fact in his testimony."[12] *See Id.* Point I is denied.

*Point II: Reasonable ROE*

■■■ Point two asserts that the Commission erred in ruling that the appropriate ROE for AmerenUE would be 10.76% "in that this ruling is unreasonable, is not

---

**11.** This is true even though, as the Commission stated in its findings, "[c]onsidering it is worth $7.6 million, the parties paid amazingly little attention to this issue. Neither Hill nor O'Bryan were effectively cross-examined about this issue at the hearing, and neither Staff nor AmerenUE effectively addressed the issue in their briefs."

**12.** In his rebuttal testimony, O'Bryan testified that he adjusted his first figure for March 2008 by $145,181,525. This figure matches the figures O'Bryan stated in his supplemental direct testimony for "unappropriated undistributed subsidiary earnings associated with AmerenUE's investment in its formerly wholly—owned subsidiaries, Union Electric Development Corporation ($6,944,266) and EEInc.—$152,125,791."

supported by competent and substantial evidence, is arbitrary and capricious and is an abuse of discretion" because the calculation: 1) included the "constant growth discounted cash flow ('DCF) model"; 2) relied on evidence presented in a prior case; 3) included a quarterly adjustment based on the DCF; 4) adopted only selective portions of the testimony of various expert witnesses; and 5) failed "to adjust the [ROE] downward due to the inclusion of a [FAC]."

Appellants contend the Commission altered the means of calculating a ROE to justify the end that it wanted. They assert the Commission relied on evidence from a rate case involving Empire District Electric Company ("Empire") in finding that an upward adjustment to a discounted cash flow model was warranted despite the fact that the Commission acknowledged that AmerenUE differed from Empire and that the evidence in the instant case also differed from that presented in the Empire case. Appellants contend that there is no evidence in the record supporting the adjustment from an annual discounted cash-flow model to a quarterly discounted cash-flow estimate. They contend that accepting part of an expert's analysis concerning risk premium while also adjusting the period of historical data so as to produce a somewhat different result "helped the [Commission] in its attempt to justify a [ROE] that was not otherwise supported by the record in this case." Appellants also argued it was unreasonable for the Commission to find that a FAC would reduce AmerenUE's operating risk but then set a ROE that reflected a higher level of operating risk.

In support of these arguments, Appellants discuss at some length the methods and applications of estimating a fair ROE as presented by the four testifying experts (including estimates based upon discounted cash flow and risk premium methods) and take issue with the way in which the Commission analyzed and reasoned from that testimony. We will not dissect those arguments here because Appellants have not demonstrated how the 10.76% ROE figure selected by the Commission—a figure that fell within the range recommended by the expert witnesses and in keeping with the average for other similarly-situated utilities—was outside the "zone of reasonableness." *See Permian Basin,* 390 U.S. at 767, 88 S.Ct. 1344; *Natural Gas Pipeline Co.,* 315 U.S. at 585, 62 S.Ct. 736. "The commission has much discretion in determining the theory or method it uses to determine rates." *State ex rel. Pub. Counsel v. Public Serv. Comm'n,* 274 S.W.3d 569, 586 (Mo.App. W.D.2009). Even if the method used by the Commission contained infirmities, so long as the resulting rate order is just and reasonable, our inquiry is at an end. *Permian Basin,* 390 U.S. at 767, 88 S.Ct. 1344; *Hope,* 320 U.S. at 602, 64 S.Ct. 281; *Public Counsel,* 293 S.W.3d at 82.

The record indicates that the average ROE for integrated utilities in the Midwest was 10.71% and that most other utilities had a FAC in their tariffs. Section 386.266.1 permits the implementation of a FAC.[13] The experts' recommended percentage for a fair ROE ranged from 9.375 to 10.9% if a FAC was permitted and 9.5 to 11.15% if such a clause was not included. After explaining its reasoning at some length, the Commission found that the ROE should incorporate a FAC, reflect balance by not rejecting a discounted cash flow method that considered the possibility of constant growth, reflect some increased risk also reflected in bond ratings, and adjust for quarterly dividends. Based on

---

**13.** All references to section 386.266 are to RSMo Cum.Supp.2010.

these considerations, the Commission found that a ROE of 10.76% would be reasonable.

Although the Commission was not bound to use any particular formula, *see Hope*, 320 U.S. at 602, 64 S.Ct. 281, and *Arkansas Power & Light Co.*, 736 S.W.2d at 462, it additionally scrutinized its 10.76%) finding by calculating an estimated ROE using a different method—the risk premium method—and reached the same result.

AmerenUE asserts that Appellants want this Court to reweigh the evidence and correctly notes that this is not our role. *Public Counsel*, 293 S.W.3d at 69. The Commission was entitled to accept some, all, or none of a given witness's testimony and draw reasonable inferences from the facts before it. *Associated Nat. Gas. Co.*, 37 S.W.3d at 292; *Public Counsel*, 293 S.W.3d at 69. The Commission's findings as to the strengths and weaknesses of the various experts' testimony "do not shock this court's sense of justice and are not clearly against the logic of the surrounding circumstances[.]" *See Public Serv.*

*Comm'n*, 186 S.W.3d at 391. Point II is denied.

### Point IV: Reasonableness of the 95% FAC

▮ Appellants' fourth point contends that passing on 95% of the changes in fuel and purchased power costs paid by AmerenUE to customers via a FAC "is unlawful, unjust and unreasonable, is not supported by competent and substantial evidence, is arbitrary and capricious, and is an abuse of discretion because:" 1) the FAC does not comply with the statutory requirement of providing an opportunity for AmerenUE to earn "no more than a fair return" on equity; and 2) the Commission's finding that the FAC would "provide a meaningful incentive to manage those costs is not supported by competent and substantial evidence and is arbitrary, capricious and an abuse of the [Commission's] discretion." The Commission may permit a FAC under section 386.266.4(1) [14] if, *inter alia*, it "[i]s reason-

14. Section 386.266.4 states:
The commission shall have the power to approve, modify, or reject adjustment mechanisms submitted under subsections 1 to 3 of this section only after providing the opportunity for a full hearing in a general rate proceeding, including a general rate proceeding initiated by complaint. The commission may approve such rate schedules after considering all relevant factors which may affect the costs or overall rates and charges of the corporation, provided that it finds that the adjustment mechanism set forth in the schedules:
(1) Is reasonably designed to provide the utility with a sufficient opportunity to earn a fair [ROE];
(2) Includes provisions for an annual true-up which shall accurately and appropriately remedy any over- or under-collections, including interest at the utility's short-term borrowing rate, through subsequent rate adjustments or refunds;
(3) In the case of an adjustment mechanism submitted under subsections 1 and 2 of this

section, includes provisions requiring that the utility file a general rate case with the effective date of new rates to be no later than four years after the effective date of the commission order implementing the adjustment mechanism. However, with respect to each mechanism, the four-year period shall not include any periods in which the utility is prohibited from collecting any charges under the adjustment mechanism, or any period for which charges collected under the adjustment mechanism must be fully refunded. In the event a court determines that the adjustment mechanism is unlawful and all moneys collected thereunder are fully refunded, the utility shall be relieved of any obligation under that adjustment mechanism to file a rate case;
(4) In the case of an adjustment mechanism submitted under subsection 1 or 2 of this section, includes provisions for prudence reviews of the costs subject to the adjustment mechanism no less frequently than at eighteen-month intervals, and shall require refund of any imprudently incurred costs

ably designed to provide the utility with a sufficient opportunity to earn a fair [ROE][.]"

Appellants argue that "[t]he statute does not specify 'at least a fair return' or 'not more than a fair return.' Thus, under the plain language of this statute, an [sic] FAC must be designed to provide *no more and no less* than a fair return." (Emphasis as stated in the original.) Appellants fault the Commission as being "geared toward a determination that the FAC will allow **at least** a fair return, and the [Commission] completely ignores the evidence that the FAC will likely provide **more than** a fair return." (Bolding as in the original.) Appellants explain that the "significant chance of allowing a return that is more than fair" is attributable to "other costs [that] might be lower than projected or revenues [that] may be higher than projected."

We understand the argument insofar as the benefit of any lower costs (presumably on things other than fuel and purchased power) and higher revenues (presumably from additional non off-system sales customers or additional usage [15]) do not pass back and forth through the FAC, but Appellants point to no evidence demonstrating the actual likelihood that AmerenUE will receive more than a fair return. Appellants state in their reply brief that the argument "relies on logic, not record evidence" and point to a witness who testified generally that if the cost of fuel was exceeded by decreases in interest rates on debt expense, then the recovery of the fuel increase could cause higher-than-authorized returns. Whether this is likely to happen under AmerenUE's rates as authorized by the Commission in this case is simply unknowable.

Section 386.266.4(3) requires a utility to file a general rate case "no later than four years after the effective date of the commission order implementing the adjustment mechanism." Additionally, the Commission must review the "prudence" of a utility's purchasing decisions every 18 months and require it to refund "imprudently incurred costs" with interest. Section 386.266.4(4). So, while it is possible that other factors could cause AmerenUE to earn a greater than approved ROE and/or fuel purchases might be made that ultimately prove imprudent, such events would then be subject to scrutiny by the Commission in AmerenUE's next rate case.

In a recent, analogous case involving a cost-recovery mechanism for environmental expenses under regulations implementing section 386.266, the Western District rejected the argument that other costs and revenues must be examined each time a FAC is relied on to change rates between rate cases. *State ex rel. Office of the Pub. Counsel & Missouri Indus. Energy Consumers v. Missouri Pub. Serv. Comm'n & Union Elec. Co. d/b/a AmerenUE*, 331 S.W.3d 677, 691 (Mo.App. W.D.2011). Public Counsel and MIEC argued that a review of all factors contributing to the overall rates must be reviewed at each adjustment of environmental cost recovery costs or the cost recovery mechanism could lead to an over-recovery. *Id.* at 689–90. The Western District stated that "section 386.266 permissibly authorizes a *single issue* ratemaking mechanism that allows periodic (automatic) adjustments outside a general rate case where other costs and revenues are *not* considered."

plus interest at the utility's short-term borrowing rate.

**15.** The record indicates that revenue from higher off-system sales would off-set cost increases within the FAC.

*Id.* at 690 (emphasis as in the original).[16] In other words, the statute does not require a guarantee that there will be no other savings or additional revenues to offset the assistance provided by a cost recovery mechanism. Rather, it provides a means for considering whether a cost recovery mechanism is needed and then allows adjustments to be made during and between required general rate cases. As Commission Staff points out in the instant case, "[t]here is no practical way that the Commission could ensure that AmerenUE earns only its authorized return and no more, because of the imprecise nature of ratemaking." Indeed, Appellants criticisms are mere speculations and do not demonstrate that the Commission acted unreasonably in permitting this particular FAC.

 Appellants also contend the Commission erred in permitting 95% of a change from base fuel costs to be passed on to customers and forcing AmerenUE to absorb 5% as an incentive to manage costs because it gave "no explanation in the Report and Order of the basic facts that the [Commission] found convincing as support for a 95 percent level as a meaningful incentive." Appellants go on to state that "[t]here is nothing in the Report and Order that will allow the reviewing Court to determine the basis on which the [Commission] chose this particular percentage, and the Court cannot simply trust that the [Commission] knows best."

Section 386.266.1 states that "[t]he commission may, in accordance with existing law, include in such rate schedules features designed to provide the electrical corporation with incentives to improve the efficiency and cost-effectiveness of its fuel and purchased-power procurement activities." Here, in addition to company absorption of 5% of costs, an efficiency testing plan to protect against "imprudent" operation and promote maintenance of generating units to help control costs was required. The Commission noted AmerenUE's existing efforts to control costs by buying coal through an affiliated company at unregulated affiliate prices and by offering employees pay incentives to minimize fuel costs. The Commission also addressed the reality that AmerenUE had to try to control fuel cost increases on its own because there was no guarantee that all increases could be permanently recovered in adjustments based on historical costs when increases are subject to subsequent regulatory action. Further, AmerenUE was put on notice that if it failed to control net fuel costs, the FAC would be reconsidered in its next rate case. A prudent utility would prefer to save money and avoid risking a "refund of any imprudently incurred costs plus interest[.]" Section 386.266.4(4).

In considering the various proposed percentage levels, the Commission found that the 80% provision was more reasonable than the 50% provision, but that even the 80% level imposed more costs than neces-

---

16. The court also recognized that "over-earnings" are not necessarily caused by a cost recovery mechanism, as follows:

> [T]he risk of over-earning is not directly attributable to the [Commission's] approval of an [environmental cost recovery mechanism]. Environmental compliance costs recoverable through an [environmental cost recovery mechanism] are simply removed from consideration when setting the utility's base rates; the risk that a utility will over-

earn based on erroneous predictions of the utility's *other* costs and revenues is the same as before approval of the [environmental cost recovery mechanism]. Moreover, when setting the utility's rate of return, the statutes and regulations allow the PSC to consider the decrease in the utility's overall business risk from the exclusion of environmental compliance costs as a factor.
>
> *Id.* at n. 16. (Emphasis as in the original.)

sary to achieve "an appropriate incentive" for AmerenUE to save fuel costs where possible. Evidence included testimony that AmerenUE had been in the minority of utilities by operating without a reasonable FAC and had suffered in its credit ratings as a result; that most FACs fully pass the changes in price to customers; and that the level of a FAC is noticed by "Wall Street" when assessing a public utility's credit worthiness.

 The 95% FAC permitted by the Commission was supported by substantial evidence and was reasonably designed to permit AmerenUE to receive a fair return on its equity. Point IV is denied.

*Point III: Reasonable depreciation rates*

 Appellants' third point asserts the Commission unlawfully, unjustly, unreasonably, arbitrarily, and without competent and substantial evidence permitted AmerenUE to over-recover more than $7 million annually in excess depreciation expense for Callaway. As AmerenUE points out, despite the fact that Appellants generally allege that the Commission's ruling on its depreciation expense is unlawful, Appellants do not assert that the Commission did not act within the language of the relevant statute in declining to change the depreciation rate. *See Missouri Gas Energy*, 210 S.W.3d at 334 ("[a] decision is lawful if it is supported by statutory language"). Further, they cite no authority for the proposition that it was unlawful for the Commission to decline to change AmerenUE's depreciation rates in the absence of a complete depreciation study. *See Public Counsel*, 293 S.W.3d at 76 (Public Counsel provided no pertinent authority that the Commission's depreciation of software was unlawful). This portion of Point III fails.

 Appellants also argue that AmerenUE's rates should be set lower now because AmerenUE's customers "should receive credit for the depreciation expense that they have already paid through rates for the Callaway plant." Yet, the Callaway accounts represent only a part of AmerenUE's physical plant, which is handled in five separate accounts for depreciation purposes. At one point in its history, Callaway was treated as having a 40–year life span and its depreciation rates were set accordingly. But in AmerenUE's last rate case, depreciation rates for Callaway were reset to a 60–year life span as it was expected that a 20–year extension would be sought for the facility's nuclear permit. Of course, depreciation based upon a 40–year life span is higher per year than that based on a 60–year life span and the Callaway accounts have not yet been adjusted to balance out the discrepancy caused by the different depreciation rates. The collective difference for the five accounts amounts to about $7.1 million per year.

Dunkel testified that "[a]t some point the actual book reserve amounts, not the theoretical reserve amounts, should be used in calculating the proposed depreciation rates for all accounts." But, he also acknowledged that he limited his recommendation to addressing the Callaway accounts only in the instant case in order to "address[ ] the most significant, largest dollar, depreciation issue that [he][has] discovered to date." Dunkel did not have current, full data for the other four depreciation accounts.

Appellants maintain that the only evidence before the Commission supported the position that other changes in depreciation would not compensate for the Callaway discrepancy and that Respondents' evidence that the depreciation of other accounts could increase was "rank specu-

lation," not competent evidence.[17] But the Commission did not decline to change the depreciation rate because other depreciation accounts would in fact offset the Callaway accounts in the future. The Commission refused to speculate in either direction about the actual effect the difference in depreciation rates would have. Instead, the Commission found that AmerenUE was not required under the rules to submit a complete depreciation study in the instant case and that to adjust the depreciation rate in the absence of such a study was not prudent. It also ruled that AmerenUE would nonetheless be required to provide full information on these issues in its next depreciation study. Further, the Commission did not rule that AmerenUE could over-recover depreciation amounts. It instead noted that "the Commission will continue to monitor that imbalance and if Public Counsel wants to raise this issue again in AmerenUE's next rate case in the context of a complete depreciation study, it is free to do so."

In setting AmerenUE's depreciation rates in 2007, the Commission was aware of the fact that there was already an imbalance between theoretical and book reserve accounts for depreciation purposes, but decided that the appropriate remedy was to monitor the situation. In the instant case—coming at a point between complete depreciation studies—the Commission elected to stay the course and wait for a full depreciation study to reveal which accounts were high and which were low. We cannot say the Commission acted unreasonably or arbitrarily in not changing depreciation rates when the evidence suggested that the effect of such a change was unknown in the absence of a complete depreciation study. Point III is denied.

*Point V: Recovery of past and possibly future vegetation/infrastructure expenses*

■ Appellants assert in their fifth point that the Commission erred in: (1) authorizing AmerenUE to recover through amortization past expenses for vegetation management and infrastructure inspections; (2) allowing the deferral for future recovery of vegetation management and infrastructure inspection expenses incurred between October 1, 2008 and February 28, 2009; and (3) instituting a 'tracking mechanism' by which excess vegetation management and infrastructure inspection costs are tracked for collection in future rate cases, in that these rulings are unlawful and unreasonable, because the amortization of past expenses constitutes unlawful and unreasonable retroactive ratemaking[.]

As for tracking future expenditures over and above the target for deferred consideration in the next rate case, Appellants insist that "[t]he obvious goal of the tracker is to allow unlawful retroactive ratemaking with respect to these expenses in a future rate case."

"Retroactive ratemaking is defined as 'the setting of rates which permit a utility

---

**17.** Appellant points to testimony from Gilbert at the hearing concerning an exhibit originally prepared for AmerenUE's 2007 rate case where he acknowledged that the exhibit suggested that other depreciation accounts "would not counteract the over-accrual in nuclear accounts but instead would add to the over-accrual[.]" Wiedmayer testified on behalf of AmerenUE that another AmerenUE account for steam production plant service *could* require an increase in depreciation rates, stating "[t]he bottom line is that isolated decreases in depreciation rates should not be made in this case where there is good reason to believe that a comprehensive depreciation study would support an increase in other depreciation rates."

to recover past losses or which require it to refund past excess profits collected under a rate that did not perfectly match expenses plus rate-of-return with the rate actually established.'" *State ex rel. AG Processing, Inc. v. Public Serv. Comm'n for the State of Missouri,* 311 S.W.3d 361, 365 (Mo.App. W.D.2010) (quoting *State ex rel. Util. Consumers Council of Missouri, Inc. v. Public Serv. Comm'n,* 585 S.W.2d 41, 59 (Mo. banc 1979)). AmerenUE contends that the three-year amortization of the expenses made in anticipation of the new rule and before the true-up date (January 1, 2008, to September 30, 2008) amounts to a $2.11 million (1/3 of $6.34 million) increase in the revenue requirement for prospective rates; vegetation/infrastructure expenses from the gap between the true-up deadline and the start of new rates (October 1, 2008, to March 1, 2009) will be addressed in prospective rates; and expenses identified by the tracker while new rates are in effect are also prospective matters.

Appellants acknowledge that 4 CSR 240–23.020(4) and 4 CSR 240–23.030(10) permit the Commission to consider excess costs that were expended in order to comply with the new rules improving maintenance requirements. But they assert these regulations do not change the fact that the due process clause of the United States Constitution prohibits retroactive ratemaking.[18] Appellants rely on *Utility Consumers Council,* 585 S.W.2d at 41, and *AG Processing,* 311 S.W.3d at 361, in asserting that the Commission's actions constituted retroactive ratemaking. These cases are not directly on point because they deal with FACs, but they are helpful in understanding some retroactive ratemaking concerns.

In *Utility Consumers Council,* our high court considered a FAC for multiple electric utilities, a "roll-in" of fuel costs collected by a utility under a temporary FAC into the base amount for a new FAC, and a surcharge for costs incurred while the temporary FAC was in effect. 585 S.W.2d at 44, 45. Some of the actual costs had not been recovered due to a "rather inexact method" of collection. *Id.* at 45. At that point in our regulatory history, section 386.266 had not been enacted and the Court held "that application of an FAC to residential and small commercial customers, as was done in this case, was beyond the statutory authority of the commission and that the FAC, roll-in, and surcharge were therefore unauthorized and cannot continue in effect." *Id.* at 47. Public counsel sought a remand for the Commission to determine the difference between what was collected using the FACs and what "would have [been] collected under a just and reasonable rate" with properly authorized increases; and "to order a refund of any such excess." *Id.* at 58.

The Court rejected the Public Commission's request, stating that

> to direct the commission to determine what a reasonable rate [w]ould have been and to require a credit or refund of any amount collected in excess of this amount would be retroactive ratemaking. The commission has the authority to determine the rate [t]o be charged, [section] 393.270. In so determining it may consider past excess recovery insofar as this is relevant to its determination of what rate is necessary to provide a just and reasonable return in the future, and so avoid further excess recovery, [s]ee *State ex rel. General Telephone Co. of the Midwest v. Pub-*

**18.** In their reply brief, Appellants add that art. I, section 13 of the Missouri Constitution prohibits retrospective laws.

*lic Service Comm'n,* 537 S.W.2d 655 (Mo.App.1976). It may not, however, redetermine rates already established and paid without depriving the utility (or the consumer if the rates were originally too low) of his property without due process.

*Id.* at 58. The Court went on to discuss that if the utilities had not received revenue from the FAC, they could have sought an increased rate instead, so a refund would be confiscatory and "and to order an offset of this refund by what a 'reasonable rate' would have been would be (retroactive) rate making at the order of this court, something we cannot do." *Id.*

The surcharge, however, could be refunded because it was a recovery of expenses that were not authorized by the expired, temporary FAC. *Id.* at 59. The Court found that the Commission could not "put a surcharge into effect to allow recovery of expenses which would only have been recoverable had the old rate [the temporarily enacted FAC] continued in effect." *Id.* There was no authority for the direct recovery of the FAC, much less those that were surcharged after the faulty FAC expired, and they could not be collected directly just because actual fuel expenses had not perfectly matched the predicted fuel expenses. Yet, as expenses, they were nonetheless relevant to future cases.

> Past expenses are used as a basis for determining what rate is reasonable to be charged in the future in order to avoid further excess profits or future losses, but under the prospective language of the statutes, [sections] 393.270(3) and 393.140(5), they cannot be used to set future rates to recover for past losses due to imperfect matching of rates with expenses.

*Id.*

In *AG Processing,* the appellants challenged a tariff filed to recover fuel expenses incurred during a period of time when the utility's FAC was not in effect. 311 S.W.3d at 364. The Court reversed the Commission's order permitting such a recovery and stated that "any adjustment to the cost of electricity based on electricity that had already been consumed by [the utility's] customers prior to the effective date clearly constitutes retroactive ratemaking." *Id.* at 367.

In a following related tariff case, the utility sought to change its rates based upon the previously approved FAC. The Western District stated that "forward-looking rate adjustments approved by the PSC pursuant to a previously adopted [FAC] do not constitute unlawful retroactive ratemaking[.]" *State ex rel. AG Processing v. Public Serv. Comm'n,* 340 S.W.3d 146, 148 (Mo.App. W.D.2011). Under the FAC, the utility accumulated its actual energy costs during a six-month period. *Id.* After that period, it filed a tariff sheet that compared what was actually expended for fuel and what was recouped in its rates during the period and requested an adjustment in rates over a subsequent twelve-month period to recover or refund the difference. *Id.* The process then repeated after each designated six-month period with the difference from each period being addressed over the course of a subsequent one-year period. *Id.*

The Court addressed its previous discussion of retroactive ratemaking in the first *AG Processing* decision and also considered the impact of the decision in *Utility Consumers Council, id.* at 150–53, stating:

> Thus, *[Utility Consumer's Council]* makes clear that [FACs] are part of the "established rate" for utility service if they are in effect at the time excess energy costs are incurred, and that it does not violate the retroactive ratemaking doctrine for a [FAC] to permit a

utility to recover excess energy costs incurred at a time when the [FAC] was in effect.

*Id.* at 153. In the first *AG Processing* case, the costs were incurred when no FAC was in effect. When a FAC was in effect at the time the costs were incurred, the result is different:

> Under [*Utility Consumer's Council*], [the utility's] implementation of its [FAC], in order to recover excess energy costs incurred in prior periods during which the [FAC] was in effect, did not violate the retroactive ratemaking doctrine. An additional consideration supports our rejection of the [a]ppellants' retroactive ratemaking argument: [the utility's] rate adjustment applies only prospectively, to electrical service to be provided to customers *after* Commission approval of the rate adjustment. The rate adjustment does not modify or recalculate the rate to be charged for electricity provided to customers *before* the rate adjustment was approved. In prior cases, this Court has rejected claims that measures to recoup previously incurred costs constitute retroactive ratemaking, when the recoupment measures operate prospectively, and do not alter the cost of utility services previously provided to consumers. *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 210 S.W.3d 330, 336 (Mo.App. W.D.2006) ("This is not retroactive ratemaking, because the past rates are not being changed so that more money can be collected from services that have already been provided; instead, the past costs are being considered to set rates to be charged in the future."); *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n*, 976 S.W.2d 470, 481 (Mo.App.

W.D.1998) ("The adjustments permitted under [the adjustment clauses] are applied only to future customers on future bills. The companies are not allowed to adjust the amount charged to past customers either up or down."). This principle is equally applicable here.

*Id.* (Emphasis as in the original.)

Here, the question does not involve FACs and their unique statutory development. The AmerenUE expenses at issue are those incurred in complying with new Commission rules requiring vigorous protection of power lines through the control of vegetation in an attempt to avoid massive power outages in future storms. The Commission found that AmerenUE was allowed, under the rules themselves, to recover extra costs expended in complying with the new rule from the official effective date of June 30, 2008, but that it was also permissible to permit a recovery of compliance expenses incurred before the actual effective date of the rules because AmerenUE believed the rules were going to go into effect on January 1, 2008, based upon the rulemaking actions of the Commission and because it was good for the ratepayers that AmerenUE did so.

On appeal, Appellants do not challenge whether the expenses were in fact extra costs incurred in compliance with the rule, that the rule was reasonably anticipated as taking effect on January 1, 2008, or that it was in the interests of ratepayers that AmerenUE commence compliance with the new rule before its official effective date.[19]

AmerenUE cannot go back in time and adjust the rates charged to past customers to reflect increased efforts to trim plant growth and maintain electric transmission components. But because these authorized additional expenses were considered

---

19. Before the Commission, Commission Staff challenged AmerenUE's increased expenditures as not being caused by compliance with the rule and suggested that the monies were spent in accord with the utility's previous, ongoing commitment to vegetation management.

through the various procedures of the instant case for future rate payers, amortized recovery of the expenses does not constitute retroactive ratemaking. *See Midwest Gas Users' Ass'n,* 976 S.W.2d at 481 (no retroactive ratemaking where adjustments for purchased gas costs were applied to future bills, amounts charged on past bills could not be adjusted, and a review process for actual costs existed).

Likewise, deferring expenses incurred in the gap between the application for rates and the effective period of the new general rate schedule is not retroactive ratemaking. In addition to the fact that the Commission did not find that the deferred amounts would in fact be recovered but instead found that "[t]he assets and liabilities shall be netted against each other and shall be considered[,]" once again, "the past rates are not being changed so that more money can be collected from services that have already been provided; instead, the past costs are being considered to set rates to be charged in the future." *Missouri Gas Energy,* 210 S.W.3d at 336.

Finally, the tracking provision does not simply set up a future situation where rates will be set retroactively. The tracking mechanism works to account for both under-and over-expenditures on vegetation/infrastructure expenses that are incurred in complying with the new regulations. The Commission will consider the net result in the next rate case, in which it may be possible for AmerenUE to prospectively recover up to 10% of $64.8 million in additional expenses. This is not retroactive ratemaking.

Point five is also denied, and the order of the Commission is affirmed.

RAHMEYER and LYNCH, JJ., Concur.