

# Missouri Court of Appeals

## Southern District

### Division Two

SPIRE MISSOURI, INC.,
f/k/a LACLEDE GAS COMPANY,

      Appellant,

vs.

PUBLIC SERVICE COMMISSION
OF THE STATE OF MISSOURI,

      Respondent.

and

OFFICE OF PUBLIC COUNSEL,

      Intervenor.[2]

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Nos. SD35485 and SD35549
Consolidated[1]
Filed: March 15, 2019

APPEAL FROM THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MISSOURI

---

[1] Case No. SD35549 was received on transfer from the Eastern District of this Court (ED106653) and consolidated with Case No. SD35485.

[2] In addition to the Office of Public Counsel, several parties sought and were granted intervention: Missouri Industrial Energy Consumers; Missouri Energy Consumers Group; Missouri Department of Economic Development-Division of Energy; Consumers Council of Missouri; Missouri School Boards' Association; the City of St. Joseph, Missouri; National Housing Trust; Environmental Defense Fund; MoGas Pipeline, LLC; USW Local 11-6; Kansas City Power & Light Company; and KCP&L Greater Missouri Operations. The latter additional entities did not file briefs on appeal.

**AFFIRMED**

Spire Missouri, Inc., f/k/a Laclede Gas Company ("Spire Missouri"),[3] appeals from two Orders rendered by the Public Service Commission of the State of Missouri ("PSC"). In three points on appeal, Spire Missouri asserts the PSC erred in ordering that $3.6 million in relocation proceeds received from the sale of one of its facilities be used to reduce rates; in denying Spire Missouri approximately half of its rate case operating expenses; and eliminating $28.8 million of its pension asset. Finding no merit to these points, we affirm the Orders of the PSC.

### Factual and Procedural History

#### *Parties*

The PSC is the state agency responsible for the regulation of public utilities, including gas corporations, in Missouri. *See* §§ 386.130 and 386.250.[4] Spire Missouri[5] is an investor-owned gas corporation regulated by the PSC. It has two retail service areas in the state: Spire Missouri East ("Spire East"),[6] formerly known as Laclede Gas Company, serving approximately 630,000 customers on the Eastern side of the state; and Spire Missouri West (Spire West), formerly known as Missouri Gas Energy, serving approximately 500,000 customers on the Western side of the state.

The Office of Public Counsel ("OPC") represents the public in cases before the PSC and on appeal from PSC orders and decisions, including the present case. § 386.710.1(2).

---

[3] Throughout the record Spire Missouri is also referred to as "the Company."

[4] All references to statutes are to RSMo 2016, unless otherwise indicated.

[5] Spire Missouri is a wholly owned subsidiary of Spire, Inc.

[6] At various places in the record, Spire Missouri, Inc., and its operating divisions, are referred to as Laclede, LAC, MGE, Spire East and Spire West. For the sake of simplicity, the former Laclede operating division is referred to as "Spire East," the former MGE operating division is referred to as "Spire West," and collectively referred to as "Spire Missouri."

### PSC Proceedings

Spire Missouri filed tariffs to implement general rate increases for gas service in its Eastern and Western service areas. Along with the proposed tariffs, Spire Missouri also provided written testimony and other documentation in support of the proposed tariffs.

The test year established for this rate case was the 12-month period ending on December 31, 2016, to be updated for known and measurable changes through June 30, 2017. The updated test year would be further trued up for known and measurable revenue, rate base, and expense items through September 30, 2017.

The PSC consolidated the Spire East rate case[7] and the Spire West case[8] for hearing purposes, but the cases remained separate as the two service areas do not have the same rates. The parties filed written direct, rebuttal, and sur-rebuttal testimony for the case in chief, and direct and rebuttal true-up testimony.

The PSC held local public hearings in Spire Missouri's Eastern and Western service areas. An evidentiary hearing was held at the PSC's primary office in Jefferson City.

### PSC's Amended Report and Order

The PSC issued its Order establishing new rates for the Spire East service area on March 7, 2018. On the same day, the PSC issued its Order establishing new rates for the Spire West service area. Both Orders became effective on March 17, 2018. In those Orders, the PSC made factual findings regarding issues on appeal.

---

[7] PSC Case No. GR-2017-0215.

[8] PSC Case No. GR-2017-0216.

***Ratemaking Treatment of Forest Park Property Transaction***

Spire East owned and operated three large service centers for several decades. One of the service centers was located near Forest Park in the City of St. Louis (the "Forest Park property"). The Forest Park property provided some services, such as gas procurement, gas controls, and diversion, not otherwise provided by other service center locations.

After the acquisition of the Spire West service area, Spire Missouri undertook certain company restructuring. The major restructuring elements in the St. Louis area were the sale of the Forest Park property, the termination of the lease for the main corporate office at 720 Olive Street, the lease of new offices at 700 and 800 Market Street, and the construction of a new satellite operation facility on Manchester Avenue.

To obtain additional negotiating leverage for the potential sale of the Forest Park property, Spire East acquired two adjacent parcels of land in January 2013. The cost of the adjacent parcels was $450,000, plus additional expenses. These properties were included in the sale of the Forest Park property.

On June 27, 2013, Spire East entered into an agreement to sell the Forest Park property to The Cortex Innovation Community in St. Louis ("Cortex"), an urban redevelopment corporation. As part of the process, Cortex obtained an appraisal of the Forest Park property, which found that the market value of the property, with all of its buildings and structures, was $6.89 million; the appraised market value for the property—with all of the buildings demolished and removed—was $7.44 million.

Cortex purchased the Forest Park property, including the buildings, other improvements, and the additional parcels of land for $8.3 million. Cortex paid an additional $5.3 million for employee and equipment expenses. The sale closed in May 2014.

Spire East's profit from the $8.3 million sale price of the Forest Park property (previously included in rate base) after subtracting the $1.8 million net book value of the buildings and $700,000 for the land, was $5.8 million. Of that amount, Spire East used $1.95 million for the purchase of furniture and fixtures at the new offices located at 700 and 800 Market Street, recording these purchases at a "zero" net book value.

Spire East reported its moving and relocation expenses, but the expenses were not tracked by specific move. With the exception of a lease expense for one temporary location at a cost of $200,000, it was unclear which expenses were used for moving Forest Park employees and equipment, and which were used for moving employees and equipment from Olive Street to the Market Street location.

Spire East did not seek PSC authorization prior to the sale of the Forest Park property.[9] At the time of the sale, the Forest Park property was necessary and useful to the provision of utility service. PSC Staff ("the Staff") argued that the gain from the sale of the Forest Park property should be shared with ratepayers because Spire East sold utility property needed for the provision of public service, which had to be replaced with a new facility at a higher cost.

Staff proposed that $3.6 million (the $5.7 million relocation proceeds, less documented moving expenses and the $1.95 million in capital expenditures for furniture and fixtures) be used to offset the cost of the more expensive Manchester facility. The PSC found that: (1) Staff's proposal was just and reasonable; (2) ratepayers should not continue to pay for property replaced with a more expensive property; and (3) the sale of the Forest Park property was not purely a land transaction, but was necessary for the provision of Spire Missouri's utility service. At the time of

---

[9] Utilities are required to obtain PSC approval for the sale of assets that are necessary to the provision of the service they provide. § 393.190.

the Forest Park property sale, the buildings on the land were in the Spire East's rate base and had an undepreciated net book value of $1.8 million. The PSC found that when the buildings were sold, any return on building costs should have been removed from rates at the time of the sale. The PSC did not authorize the sale, and there was no adjustment to rates made at the time of the sale.

Spire East's recording of the sale transaction reduced the building asset account by $3.3 million. However, the PSC found that the reduction of the depreciation reserve by the same amount did not allow for the recognition of the $1.8 million loss on the retirement of the Forest Park buildings, and misrepresented the effect of the sale on the utility's depreciation reserve.

The PSC ordered Spire East to account for the sale of the Forest Park transaction in accordance with the FERC's USoA[10] by increasing its accumulated depreciation reserve by the $1.8 million loss on the retirement of the Forest Park buildings; that neither a return of the $1.8 million undepreciated value of the Forest Park buildings, nor any return on the $1.8 million would be included in rates going forward; and that the remainder of the $5.8 million gain belonged to the shareholders.

The PSC found that Spire East partially replaced the Forest Park property with the Manchester facility; that while the Manchester facility might be less expensive to operate than the Forest Park facility, it was a more expensive capital asset than the Forest Park property; that the rates established in this case included this more expensive capital asset; and that it was appropriate for the PSC to order a portion of the $5.7 million in relocation costs be used to offset the higher costs of this partial replacement facility.

---

[10] The Uniform System of Accounts (USoA) used by the Federal Energy Regulatory Commission (FERC) specifies the accounting treatment for the sale of utility assets that constitute an operating unit or system.

The PSC also found that while the actual expenses incurred to relocate Forest Park employees could not be determined from the evidence presented, the $200,000 lease expense and the $1.95 million capital contributions should be deducted from the $5.7 million total before the remainder was used to offset the construction cost of the new Manchester facility.

The PSC ordered Spire East to create a regulatory liability to record the rate base offset of the relocation expense, amortized over five years, effective on the date of the rates set in this case.

### *Rate Case Expense*

Rate case expense is the sum of the costs a utility incurs in preparing, filing, and litigating a rate case.

Spire Missouri's witness on rate case expense testified that the company enters into a rate case with an estimate of its rate case expenses, but that Spire Missouri had no firm ceiling or other mechanism in place to limit those expenses.

When Spire Missouri filed its rate cases, it budgeted rate case expense of $994,447, with $596,668 budgeted in Spire East's rate case, and $397,779 budgeted in Spire West's rate case. Spire Missouri's anticipated annual expense to be recovered from these rate cases over the proposed amortization period[11] was $198,889 for Spire East, and $132,593 for Spire West.

By the time of hearing, Spire Missouri's estimated rate case expense had increased to $1.3 million, and thereafter exceeded even that estimate.

Staff recommended that the proposed rate case expenses be recovered via a sharing mechanism between the ratepayers and the shareholders based on the ratio of Spire East and Spire

---

[11] An amortization is used to recover a specific amount of money such as the cost of the depreciation study over a set period of time. The cost of the study is annualized to divide the total cost of the study to an equal amount to be recovered in rates each month over the length of the amortization.

West's PSC-authorized revenue requirement increase to their requested revenue increase, net of Staff's adjustments.

Staff recommended that the allowed rate case expense be split between Spire East and Spire West, 53.5 percent and 46.5 percent respectively, based on each division's requested revenue requirement increase; that rate case expense be normalized[12] over four years, the approximate time between rate cases for both Spire East and Spire West; and one disallowance[13] for the procurement of a Cash Working Capital study, with the cost of that study to be borne entirely by the shareholders as it was not a prudent expense.

The OPC recommended a disallowance for the expenses related to Spire Missouri witness Thomas J. Flaherty because of the high hourly rate charged by this expert.

Spire Missouri admitted that it purposefully takes more "aggressive" positions and builds "a little bit of cushion" into its requests. Spire Missouri's rate case witness testified that the company never expected to receive the full amount that it requested.

The PSC found that Spire Missouri pursued issues and incurred rate case expense that largely benefited only shareholders. Notably, Spire Missouri employed an outside witness to support its recommended return on equity of 10.35 percent, the highest of any large utility in Missouri. The PSC observed that: (1) Spire Missouri's witness testified that the goal of the utility is to be awarded its requested return of equity; (2) Spire Missouri pursued unique shareholder-focused ratemaking tools intended to insulate shareholders from risk, including three new tracking mechanisms and a revenue stabilization mechanism; and (3) Spire Missouri sought utility expenses

---

[12] A normalization adjustment is an adjustment made to reflect normal, ongoing operations of the utility.

[13] The disallowance proposed by Staff would have excluded this component of rate case expense entirely from recovery in rates. Shareholders are responsible for expenses that are disallowed in rates.

that were highly discretionary and did not benefit customers, such as incentive compensation tied to earnings per share, a retention mechanism, a one-time adder to return on equity for claimed benefits of acquisitions in Alabama and Mississippi, and performance metrics.

The PSC found that Spire Missouri controlled approximately half of the issues that went to hearing. It also found that the shareholders who controlled 50 percent of the rate case issues should share 50 percent of the rate case expense. The PSC made an exception for the cost of the depreciation study and the cost of the customer notices that were required by rule or by order, and directed that these be allocated entirely to the ratepayers. The remainder of rate case expense would be allocated 50 percent to ratepayers and 50 percent to shareholders.

Before these rates cases were filed, the OPC had filed overearnings complaints against Spire East and Spire West. The complaints were stayed pending the filing of these rate cases. Spire Missouri argued that sharing rate case expense is inappropriate because it was required to file these rate cases in relation to the overearnings complaints, and by the Infrastructure System Replacement Surcharge ("ISRS") statute.

The PSC found that while Spire Missouri was required to participate in the overearnings complaints, it was within the utility's discretion to file the rate cases. The PSC also found that the ISRS statute did not require Spire Missouri to file these rate cases; rather, the statute merely required Spire Missouri to file a rate case if it wanted to continue to collect an ISRS surcharge. Spire Missouri elected to continue collecting an ISRS surcharge, and filed these rate cases to that end.

Staff and the OPC each argued that certain rate case expenses incurred by Spire Missouri should be excluded from rates and borne explicitly by shareholders because the expenses were not prudent. The PSC rejected these proposals and declined to find that any specific item of rate

9

expense was imprudent. Instead, the PSC found that a rate-case-sharing mechanism would act as sufficient incentive for the utility to manage its costs.

The PSC ordered that: (1) Spire Missouri recover the full cost of the depreciation study over five years; (2) the cost of the customer notices be normalized over four years; (3) 50 percent of the remainder of Spire Missouri's rate case expense was to be recovered in rates; and (4) the recoverable rate case expense would be recovered over four years (the rough equivalent of the length of time between the utility's rate cases).

### *Ratemaking Treatment of Prepaid Pension Assets*

Spire East has a collective bargaining agreement with its union employees that offers those employees a lump-sum payment at retirement. Spire East made pension contributions in excess of those required by federal statutory minimums to avoid benefit restrictions under the Pension Protection Act and to avoid variable premiums by the Pension Benefit Guaranty Corporation ("PBGC").[14]

The pension asset is a regulatory asset that represents an amount owed by ratepayers for Spire East's and Spire West's contributions to the company pension funds that have not been recovered in rates. A pension liability is the opposite of a pension asset in that a liability is created when the company has recovered more from ratepayers than it has paid into the pension funds with regard to the authorized regulatory payments.

Staff, the OPC, and Spire West agreed that Spire West had a pension liability of $28.4 million.

---

[14] The PBGC is a federal agency created by the Employee Retirement Income Security Act (ERISA) that provides a form of insurance to protect pension benefits in the event of a default by a sponsor of a pension plan.

Staff and Spire East disagreed as to the amount ratepayers paid in pension expense between 1990 and 1994 for both FAS[15] 87 and FAS 88, and from 1994 to 1996 for the FAS 88 account.

Spire East argued that: (1) between the time it adopted FAS 87 in 1987 and its rate case in 1994, its pension asset accumulated $19.8 million; (2) its pension asset accumulated $9 million under FAS 88 between its 1994 rate case and its 1996 rate case; and (3) its prepaid pension asset was $28.8 million higher than Staff's position.

The PSC adopted the 1994 stipulation and agreement in GR-94-220 as a resolution of all issues and permitted Spire East to book its pension and Other Post-Employment Benefit ("OPEB") expenses to FAS 87 and FAS 106[16] accounts, respectively. The report and order in GR-94-220 authorized the deferral of OPEB expenses, Supplemental Executive Retirement Plan ("SERP"), and directors' pension plans described in paragraphs 8 and 9 of the stipulation and agreement in that case. The stipulation and agreement in GR-94-220 stated that the parties agreed as to Spire East's adoption of FAS 87 for all qualified pension plans and that PSC approval of the stipulation and agreement would constitute all necessary authorization for Spire East to use FAS 87 and FAS 106 for ratemaking purposes.

Prior to September 1, 1996 (when rates from GR-96-193 became effective) accumulated pension assets in FAS 88 were not included in Spire East's cost of service.

Paragraph 7 of the PSC-approved stipulation and agreement from Spire East's 2013 rate case, GR-2013-0171, stated that Spire East was to be allowed rate recovery for contributions it would make to avoid benefit restrictions specified by the Pension Protection Act of 2006 (PPA).

---

[15] FAS 87 and FAS 88 are financial accounting standards used in generally accepted accounting principles ("GAAP"). FAS 87 and FAS 88 contain financial accounting guidance for the accrual of deferred pension expenses.

[16] FAS 106 sets out GAAP accounting guidance for OPEB expenses.

Spire East contributed funds sufficient to avoid the restrictions outlined in the PPA. The stipulation and agreement in GR-2013-0171 also stated that Spire East could include pension asset contributions in excess of ERISA minimums because they were made to avoid variable premiums from the PBGC.

The PSC found that the parties were using a cash contribution method, and not FAS 87 or FAS 88 accrual accounting prior to the effective date of GR-94-220 (September 1, 1994); for ratemaking purposes, the recording of the difference between the utility's pension fund contributions and the amount collected in rates began September 1, 1994; the report and order in GR-94-220 resolved relevant issues, and authorized Spire East to book its pension and OPEB expenses to FAS 87 and 106 accounts. The PSC found that the sworn testimony of Staff and Spire Missouri's witnesses knowledgeable of the issues during the time in question to be more persuasive than the conclusions drawn by Spire East and its witnesses more than 20 years later.

The PSC determined that Spire West's pension liability was $28.4 million. It further determined that the appropriate amount of Spire East's prepaid pension asset was $131.4 million, and ordered an eight-year amortization for this prepaid pension asset.

### Post-Order Proceedings

Spire Missouri filed tariffs to implement the new rates for Spire East and Spire West authorized by the Orders. Spire Missouri also filed timely applications for rehearing of the Orders. The PSC denied the applications for rehearing. This appeal followed.

### Standard of Review

The PSC's decision is presumed valid, and we will affirm unless appellant demonstrates that the decision is "unlawful" or "unreasonable." *Missouri Pub. Serv. Comm'n v. Union Elec. Co.*, 552 S.W.3d 532, 538 (Mo. banc 2018). The PSC's decision is not unlawful where the PSC

12

had "statutory authority to entertain . . . and decide" the case.[17] *Id.* (internal quotation and citation omitted). The PSC's decision is not unreasonable "if it is supported by substantial, competent evidence on the whole record, it is not arbitrary or capricious, and it is not based on an abuse of its discretion." *Id.* (internal quotations and citations omitted). "[T]he challenger bears the burden of disproving [the decision's] validity." *State ex rel. Praxair, Inc. v. Pub. Serv. Comm'n of the State of Missouri*, 328 S.W.3d 329, 333 (Mo.App. W.D. 2010).

> The PSC fixes rates prospectively and not retroactively. Our courts do not fix rates. Our courts may only review, and affirm or set aside or reverse and remand the PSC's rate-fixing orders. Our courts cannot make the PSC do retroactively and our courts cannot retroactively do that which the PSC, or other rate-making body, only does prospectively.

*Brooks v. Empire Dist. Elec. Co.*, 420 S.W.3d 586, 592 (Mo.App. S.D. 2013) (internal quotation and citation omitted).[18]

### Governing Principles of Review

Spire Missouri's brief contains three points relied on—the challenges in Spire Missouri's associated argument sections are more copious. We recite Spire Missouri's points, and (to the extent our discernment affords) the arguments Spire Missouri makes under each point:

---

[17] This, in part, is because this Court "will not substitute our judgment for the Commission's on issues within the realm of the agency's expertise," and the Commission's expertise is delineated by statute. *Matter of Application of Laclede Gas Co. to Change Its Infrastructure Sys. Replacement Surcharge in Its Missouri Gas Energy Serv. Territory v. Office of Pub. Counsel*, 539 S.W.3d 835, 838–39 (Mo.App. W.D. 2017) (internal quotation and citation omitted).

[18] Spire Missouri's brief requests that this

> Court instruct the PSC, on remand, to provide temporary rate adjustments consistent with the Reconciliation approved by the PSC on April 25, 2018, for the Forest Park Relocation Proceeds and the Rate Case Expense Sharing. With respect to the Prepaid Pension Asset Disallowance, Spire Missouri requests that the Court instruct the PSC, on remand, to confirm the amount of the Company's regulatory pension asset consistent with the Court's decision and, pursuant to Section 386.520.2(3), to approve a temporary rate adjustment designed to allow Spire Missouri to recover from its customers the amounts it should have collected in rates for a return on that asset, beginning on April 19, 2018.

In light of *Brooks*, 420 S.W.3d at 592, it is doubtful that our appellate authority over the PSC's order extends so far as Spire Missouri's requests for relief.

**Point I**

I.        The PSC erred in the Amended Report and Order ordering that $3.6 million in relocation proceeds received by the Company in connection with the sale of its Forest Park facility be used to reduce rates, because such action and ruling, being subject to review under Sections 386.510 and 536.140.2 R.S.Mo.: (a) constituted unlawful retroactive ratemaking, in that the PSC used monies received by the Company prior to the test year period to reduce future rates; and (b) was unlawful, arbitrary and capricious, in that it was contrary to the traditional treatment of gains on the sale of utility property and confiscated monies, which the company was entitled to retain and use in the manner it deemed appropriate; and (c) was arbitrary, capricious and unsupported by the competent and substantial evidence on the record, in that the PSC's conclusion that a new facility was more expensive than the Forest Park facility was both erroneous and contrary to the undisputed evidence.

*Argument Section Challenges (Point I)*

(1)      "[T]he PSC's decision is contrary to Missouri law" because it engages in "unlawful retroactive ratemaking[]";

(2)      "[T]he PSC's decision is contrary to . . . [its] own policies for how to treat gains and losses realized from the sale of utility assets[]"; and

(3)      The PSC's decision reflects "[a]rbitrary and capricious blindness to the competent and substantial record evidence."

(Emphasis omitted).

**Point II**

II.      The PSC erred in the Amended Report and Order by denying the company nearly half of its rate case operating expenses, because such action and ruling, being subject to review under Sections 386.510 and 536.140.2 R.S.Mo., was unlawful, arbitrary, capricious and unreasonable, in that it denied recovery of those expenses without finding that any of said expenses were imprudent, excessive or otherwise unreasonable.

*Argument Section Challenges (Point II)*

(1)      "The rate case disallowance is also unlawful because there was never a showing of any harm to ratepayers as a result of these expenditures[]";

(2)     "The PSC's decision is also arbitrary and unreasonable as it is not supported by competent and substantial evidence[]" because the PSC "made no finding regarding how the issues raised by the Company in the rate case affected rate case expense[]";

(3)     "The PSC's decision is further unreasonable in that it cites the Company's high rate of return on equity . . . as a reason to disallow rate expense[]";

(4)     "The PSC's decision is also unreasonable as it charged the Company with litigating the Forest Park property issue[]";

(5)     "The PSC's decision to disallow rate case expense is also unlawful in that it violates Section 393.130.1 R.S.Mo. as an abdication of its duty to set just and reasonable rates[]";

(6)     The PSC's decision is "so flawed as to indicate bias by the PSC against utilities[]";

(7)     "The PSC's decision is also arbitrary and capricious for the reason that it treats the Company with the historically lower rate case expense more harshly than the company with the historically high rate case expenses 'substantially higher than historical levels and higher than other utilities in Missouri[]'"; and

(8)     The PSC "abused its discretion in converting a logical litigation strategy into a rate case expense penalty."

## Point III

III.     The PSC erred in the Amended Report and Order eliminating $28.8 million of the Company's pension asset, because such action and ruling, being subject to review under Sections 386.510 and 536.140.2 R.S.Mo., was arbitrary, unreasonable and unsupported by competent and substantial evidence on the whole record, in that it directly conflicted with the clear evidence in the record demonstrating that a pension asset accrued as a result of the rates set in the company's 1990 and 1994 rate cases.

### *Argument Section Challenges (Point III)*

(1)     The challenged aspect of the PSC's decision is based on a "conclusory statement" instead of a "finding of fact' affording the appellate court insufficient basis to affirm the decision of the PSC;

(2)     The PSC failed to mention the 1990 rate case, therefore its decision was "arbitrary, unsupported by competent and substantial evidence, and [was] contrary to the overwhelming weight of the evidence[]";

(3)     "[S]ince the Company bases the pension asset on the difference between its cash contributions and its own FAS 87 expense [in the 1990 rate case], the actual expense in rates should have created a larger asset than the Company is requesting because those rates would have reflected a lower FAS 87 expense than on [Spire East]'s books[]";

(4)     The PSC ignored "incontrovertible evidence in the Company's favor[]";

(5)     The PSC "ignored the facts and decided the issue in a manner that was plainly contrary to the overwhelming weight of the evidence[]";

(6)     "Since both parties used FAS 87 to determine pension expense in the 1990 rate case, it was arbitrary and unreasonable for the PSC to depart from the rationale it used to rule against the Company in the 1992 case[]";

(7)     "Company witness Fallert's uncontroverted testimony that due to the close link between FAS 87 and FAS 88, the Company would not have used FAS 87 in rates without also applying FAS 88"; and

(8)     The PSC's "reasons [for] supporting the exclusion of FAS 88 from the 1994 rate case are non-sensical."

To be clear, points relied on are not mere headings—their proper formulation is *sine qua non* (and circumscriber) of matters warranting treatment on appeal. Rule 84.04[19] is a **mandate**.[20] It **commands** that an appellant's "argument shall be limited to those errors included in the 'Points Relied On.'" Rule 84.04(e). "[A]llegations of error not briefed or not properly briefed **shall not be considered in any civil appeal**[.]" Rule 84.13(a) (emphasis added).

> The points relied on provide the opposing party with notice as to the precise matters at issue and inform the appellate court of the legal issues presented for review. This rule is not a judicial word game or a matter of hypertechnicality; it serves to put opposing litigants and the court on notice of the specific matters at issue. Further, an appellant's argument section must 'substantially follow' the order of the point relied on. Rule 84.04(e). Deficient points relied on force respondents and appellate

---

[19] All rule references are to Missouri Court Rules (2018).

[20] **Peters v. Johns**, 489 S.W.3d 262, 268 n.8 (Mo. banc 2016) ("Multifarious points relied on are noncompliant with Rule 84.04(d) and preserve nothing for review."); **Bramer v. Abston**, 553 S.W.3d 872, 880 (Mo.App. S.D. 2018) ("To be clear, compliance with Rule 84.04 is *mandatory*. Inadequate briefs are a disservice to the parties and a burden on the justice system. Our preference to resolve matters on the merits, is not a license for non-compliance with Rule 84.04. . . . [E]ach time we review a noncompliant brief *ex gratia*, we send an implicit message that substandard briefing is acceptable. It is not.") (internal quotations and citations omitted) (emphasis in original).

courts to search the briefs and the record to determine appellant's assertions, which wastes judicial resources and creates the danger that appellate courts interpret the appellant's arguments differently than the appellant intended or the opponent understood.

*Scott v. King*, 510 S.W.3d 887, 892 (Mo.App. E.D. 2017).[21]  The matters contended in Spire Missouri's argument sections far exceed the scope entailed by its points relied on.

While Spire Missouri's brief is not absent of legal citation, it is a stretch to say that all of Spire Missouri's arguments are sufficiently ***grounded*** by legal authority.  Goodly portions of Spire Missouri's argument contain no citations to legal authority whatsoever.

Spire Missouri's arguments conflate factual and legal challenges, and even conflate sub-varieties of factual challenges.[22]  Not supported by substantial evidence, against the weight of the evidence, and legal error are separate challenges—they may not be combined in a single point,[23] and may certainly not be combined in the argument section of a single point.

Moreover, this Court has held that factual challenges (including challenges to the ruling or order of an administrative agency) must comport with the analytical sequence set forth in ***Houston v. Crider***, 317 S.W.3d 178, 186-87 (Mo.App. S.D. 2010):

> A not-supported-by-substantial-evidence challenge requires completion of three sequential steps:
>
> > (1)  identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
> >
> > (2)  identify all of the favorable evidence in the record supporting the existence of that proposition; and,

---

[21] *See* **State ex rel. Koster v. ConocoPhillips Co.**, 493 S.W.3d 397, 403 n.7 (Mo. banc 2016) ("the role of the points relied on" is "identifying [and] limiting the claims an appellant may assert on appeal.") (citation omitted).

[22] *See* **State ex rel. Noranda Aluminum, Inc. v. Missouri Pub. Serv. Comm'n**, 356 S.W.3d 293, 305 n.10 (Mo.App. S.D. 2011).

[23] **J.A.R. v. D.G.R.**, 426 S.W.3d 624, 630 n.10 (Mo. banc 2014).

(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

On the other hand, an against-the-weight-of-the-evidence challenge requires completion of four sequential steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Houston*, 317 S.W.3d at 187. Spire Missouri's arguments do not succeed (or even belie an attempt) at complying with *Houston*'s mandates. "[A]dherence to this analytical formula is mandatory not just because this Court says so, but because it reflects the underlying criteria necessary for a successful challenge—the absence of any such criteria, even without a court-formulated sequence, dooms an appellant's challenge." *Nichols v. Belleview R-III Sch. Dist.*, 528 S.W.3d 918, 928 (Mo.App. S.D. 2017).

This Court has previously discussed the significant judicial interests at stake in this vein:

Yet [*ex gratia* review] grants Assessor only a fleeting reprieve because each of his points ostensibly challenges the sufficiency or weight of the evidence. No such challenge can succeed on appeal unless it substantially tracks the rubric first set out in *Houston v. Crider*, 317 S.W.3d 178, 186-87 (Mo. App. S.D. 2010), and followed in scores of reported opinions since.[24] Assessor disregards the format for asserting such complaints, which renders all such arguments analytically and persuasively

---

[24] *See Parker v. Doe Run Co.*, 553 S.W.3d 356, 359-60 n.4 ("Including opinions, like this one, reviewing administrative-agency decisions.") (citing cases).

worthless.  This means, in turn, that for this Court to grant any of Assessor's points, *we* would have to develop and support *our own **Houston*** argument in Assessor's favor, which "would thrust us into becoming an advocate on Assessor's behalf; a role we are prohibited from assuming. ***Id.*** at 189.

***Parker v. Doe Run Co.***, 553 S.W.3d 356, 359–60 (Mo.App. S.D. 2018) (citing cases) (emphasis in original.

"[E]quality before the law depends on equal enforcement of our Missouri Court Rules, including Rule 84.04." ***State ex rel. Hawley v. Allen***, 536 S.W.3d 380, 383 (Mo.App. S.D. 2018). This Court has sometimes overlooked briefing deficiencies in cases such as this, "mindful of the significant interests at stake, including those of the public." *See e.g.,* ***State ex rel. Noranda Aluminum, Inc. v. Missouri Pub. Serv. Comm'n***, 356 S.W.3d 293, 305 n.10 (Mo.App. S.D. 2011). However, *ex gratia* review is a gift, not a right.  Significant interests do not lower the bar for appellate briefing (nor, as applicable in this appeal, the means or experience to provide it).  If anything, in cases where counsel do not lack for stakes or experience, we are all the more vigilant for strategic non-compliance.[25]  In addition,

> Rule 84.04(d) compliance is particularly critical in a case such as this where the facts are complex.  Because [appellant's] briefs do not adequately advise this Court of the contentions asserted or merit thereof, we face the dilemma of deciding this case (and possibly establishing future precedent) on the basis of inadequate briefing and advocacy.  In addition to being inherently unfair to the other party to the appeal, it is unfair to parties in other cases awaiting disposition because it takes from them appellate time and resources which should be devoted to expeditious resolution of their appeals.

***Parker***, 553 S.W.3d at 359 (internal quotations and citations omitted).

---

[25] ***Nichols***, 528 S.W.3d at 931 (Scott, J., concurring) ("Sometimes we look past such deficiencies, especially when an inexperienced lawyer has at least tried to comply or when the error seems unintentional, unknowing, or otherwise understandable and not willful.  But [appellant's] experienced and talented counsel work at or near the high end of the appellate-practice spectrum.  Attorneys of this caliber and appellate experience do not simply overlook Rule 84.04['s] [requirements.]").

We do not suggest that Spire Missouri's brief intends, by obfuscation, to create the opportunity for (and invite the strategic advantage of) arguments undiscovered and unanswered by the respondents—but that is nevertheless the effect in the present appeal. For that reason, in this instance full *ex gratia* review is inappropriate. It is not at all clear that the Staff and the OPC have been able to identify the same arguments as this Court, or even the same arguments between themselves. This risk of prejudice is exactly why Rule 84.04 exists, and must be followed and enforced. Instead, *ex gratia* we summarily address the main thrusts of Spire Missouri's arguments, which we discern the Staff and OPC to have understood and briefed.

**Analysis**

***Point I: Forest Park Property***

It its first point, Spire Missouri argues that the PSC erred in its Order, pursuant to "sections 386.510 and 536.140.2," by ordering that $3.6 million in relocation proceeds received by Spire Missouri in connection with the sale of its Forest Park property be used to reduce rates.

Spire Missouri asserts that "[i]n reaching back to the test year to use approximately $3.6 million of [the] relocation proceeds to reduce the Company's rates on a going-forward basis, the PSC clearly engaged in unlawful retroactive ratemaking." The gist of Spire Missouri's premise is that Spire Missouri should have been allowed to retain a more favorable amount of the proceeds from a sale requiring prior PSC authorization (the authorization for which Spire Missouri neither sought nor obtained). Spire Missouri, in essence, relies on its failure to file, which prevented the PSC's timely review, and now says the PSC cannot reach back as such would constitute retroactive ratemaking.

Spire Missouri directs us to ***State ex. Rel. Utility Consumers Council of Missouri v. Missouri Pub. Serv. Comm'n***, 585 S.W.2d 41, 59 (Mo. banc 1979):

The utilities take the risk that rates filed by them will be inadequate, or excessive, each time they seek rate approval. To permit them to collect additional amounts simply because they had additional past expenses not covered by either clause is retroactive rate making, i.e., the setting of rates which permit a utility to recover past losses or which require it to refund past excess profits collected under a rate that did not perfectly match expenses plus rate-of-return with the rate actually established[.]

*Id.* at 59.

The Staff and the OPC do not dispute the proposition that retroactive ratemaking is generally prohibited. Instead, they argue that no such prohibited retroactive ratemaking occurred. The OPC points to section 393.190.1, which, in relevant part, states:

No gas corporation, electrical corporation, water corporation or sewer corporation shall hereafter sell, assign, lease, transfer, mortgage or otherwise dispose of or encumber the whole or any part of its franchise, works or system, ***necessary or useful in the performance of its duties to the public***, nor by any means, direct or indirect, merge or consolidate such works or system, or franchises, or any part thereof, with any other corporation, person or public utility, ***without having first secured from the commission an order authorizing it so to do***.

§ 393.190.1 (emphasis added).

The PSC, basing its decision on section 393.190.1 and on testimony from Spire Missouri and the Staff's witnesses, found that "[Spire Missouri] did not seek Commission authorization prior to the sale of the Forest Park property[]", and the "Forest Park property was necessary and useful in the provision of utility service at the time of its sale." Further, the PSC found credible Staff's witness testimony that "the gain from the sale of the Forest Park Property should be shared with ratepayers because [Spire East] sold utility that was needed for the provision of utility service that had to be replaced with a facility at a higher cost."

Retroactive ratemaking is "the setting of rates which permit a utility to recover past losses or which require it to refund past excess profits collected under a rate that did not perfectly match expenses plus rate-of-return with the rate actually established." ***State ex rel. AG Processing, Inc.***

***v. Missouri Pub. Serv. Comm'n***, 311 S.W.3d 361, 365 (Mo.App. W.D. 2010)[26] (internal quotation

and citation omitted).  Here, the PSC did not retroactively set rates based on disparity between

rates and expenses—it exercised its accounting authority to treat the proceeds from an unapproved

sale of property "necessary and useful" to Spire Missouri's services.[27]  *See* section 393.140(4).[28]

The Western District of this Court recently dealt with a similar argument in the case of ***In***

***Matter of Kansas City Power & Light Co.***, 509 S.W.3d 757, 769–71 (Mo.App. W.D. 2016).  The

Court held that regardless of whether an item is classified as an "asset or liability," "[t]he PSC

. . . remains the authority that determines when an item may be included in a different accounting

---

[26] The principle aims, at least in part, at preventing the PSC or the governed utility from "trapping" the other by deviating from approved processes.  ***State ex rel. Associated Natural Gas Co. v. Missouri Pub. Serv. Comm'n***, 954 S.W.2d 520, 531 (Mo.App. W.D. 1997).  This accords with "underlying policy of predictability, meaning that if a utility is bound by the rates which it properly filed with the appropriate regulatory agency, then its customers will know prior to purchase what rates are being charged, and can therefore make economic or business plans or adjustments in response."  ***Id.***

Spire Missouri points to inapplicable hypotheticals (and improper applications of the rule to those hypotheticals), to suggest that "[p]ermitting these kinds of 'exceptions' would swallow up the rule."  We discern no new "exception" to the rule as applied here—rather, Spire Missouri's ***own*** arguments venture the "kinds of 'exceptions'" that risk "swallow[ing] up the rule."

[27] The PSC has the:

> power, in its discretion, to prescribe uniform methods of keeping accounts, records and books, to be observed by gas corporations, electrical corporations, water corporations and sewer corporations engaged in the manufacture, sale or distribution of gas and electricity for light, heat or power, or in the distribution and sale of water for any purpose whatsoever, or in the collection, carriage, treatment and disposal of sewage for municipal, domestic or other necessary beneficial purpose.  It may also, in its discretion, prescribe, by order, forms of accounts, records and memoranda to be kept by such persons and corporations.  Notice of alterations by the commission in the required method or form of keeping a system of accounts shall be given to such persons or corporations by the commission at least six months before the same shall take effect.  Any other and additional forms of accounts, records and memoranda kept by such corporation shall be subject to examination by the commission.

§ 393.140

[28] Spire Missouri also argues that this Court should grant relief in that the PSC's treatment is "inconsistent with [its] traditional practice[.]"  We need not (and do not) resolve the accuracy of this assertion: "[t]he Commission, like other administrative agencies, is not bound by *stare decisis* based on prior administrative decisions, so long as its current decision is not otherwise unreasonable or unlawful."  ***City of O'Fallon v. Union Elec. Co.***, 462 S.W.3d 438, 445 (Mo.App. W.D. 2015) (internal quotation and citation omitted).  "Courts are not concerned with alleged inconsistency between current and prior decisions of an administrative agency because it is the impact of the rate order which counts; the methodology is not significant."  ***Praxair***, 328 S.W.3d at 340 (internal quotation and citation omitted).

22

period for the purpose of developing authorized rates." *Id.* at 770.[29] The PSC had authority to make such a determination here, and it did so.

Spire Missouri fails to demonstrate that the PSC's decision to direct $3.6 million of Spire Missouri's relocation proceeds be used to reduce rates was unlawful, or arbitrary and capricious. Point I is denied.

### Point II:  Rate Case Operating Expenses

In its second point, Spire Missouri argues that the PSC erred in its Order by denying Spire Missouri "nearly half of its rate case operating expenses, because such action and ruling, being subject to review under sections 386.510 and 536.140.2 R.S.Mo., was unlawful, arbitrary, capricious and unreasonable, *in that it denied recovery of those expenses without finding that any of said expenses were imprudent, excessive or otherwise unreasonable*." (Emphasis added).

Rate case expenses "are the incremental costs incurred by the utility directly related to its application to change its general rate levels." *KCP&L*, 509 S.W.3d at 775. "In rate-making proceedings, a strong presumption exists in favor of the validity of the conclusions of an experienced administrative body after a complete hearing." *State ex rel. GTE N., Inc. v. Missouri Pub. Serv. Comm'n*, 835 S.W.2d 356, 361 (Mo.App. W.D. 1992). "The complexities inherent in a rate of return determination necessarily require that the Commission be granted considerable discretion." *State ex rel. Associated Nat. Gas Co. v. Missouri Pub. Serv. Comm'n*, 706 S.W.2d 870, 880 (Mo.App. W.D. 1985).

---

[29] *See* C.S.R. 4, § 240-20.030(4) (2003) ("the commission does not commit itself to the approval or acceptance of any item set out in any account for the purpose of fixing rates or in determining other matters before the commission.").

Spire Missouri argues that "the PSC affirmatively states that it does not find any expenses to be imprudent," but then "lopp[ed] off nearly half the expense." The PSC's findings on this issue frame our review:

•While Spire Missouri is able to recoup the costs of its legal counsel and expenses through utility service rates, [the OPC], the entity representing ratepayers, operates within a tight annual budget, and the intervenors pay their own legal and expert witness expenses.

•Spire Missouri's witness testified that the company enters into a rate case with an estimate of its rate case expenses but had no firm ceiling or other mechanism in place to limit those expenses.

•Approximately half of the issues in this case were raised by Spire Missouri, which has a high level of discretion and control over the content and methodologies proposed in the rate case.

•Awarding a utility all of its incurred rate case expenses could provide that utility with a significant financial advantage over other participants in the rate case process, who may be constrained by budgetary and other financial restrictions. Such a practice does not encourage reasonable levels of cost containment in the utility's rate case expense decisions.

•Staff proposed one disallowance for the procurement of an outside consultant firm, ScottMadden, to perform a Cash Working Capital study. Staff proposed that this expense be born entirely by the shareholders and not be shared with the ratepayers because it was not a prudent expense.

•[OPC] also recommended a disallowance for the expenses related to Spire Missouri's witness, Thomas J. Flaherty, because of the high hourly rate charged by this expert.

•[Spire Missouri] also admitted that it purposefully takes the more 'aggressive' positions and builds 'a little bit of cushion' into its requests.

•Spire Missouri has pursued issues and incurred rate case expenses in this case that largely benefit only the shareholders, such as employing an outside expert witness to support its recommended return on equity of 10.35 percent, the highest of any large Missouri utility including two utilities owning nuclear power plants, and litigating the Forest Park property issue.

24

•Spire Missouri has pursued more new, unique shareholder-focused ratemaking tools in this case to insulate shareholders from risk, such as three new tracking mechanisms (environmental expense tracker, cyber security tracker, and major capital projects tracker) and a revenue stabilization mechanism.

•Spire Missouri has pursued utility expenses that are highly discretionary, do not benefit customers, and are typically allocated entirely to shareholders, such as incentive compensation tied to earnings per share and a retention mechanism, a onetime adder to ROE for its claimed benefits of acquisitions in Alabama and Mississippi, and performance metrics.

•Spire Missouri's witness for rate case expense testified that the basic 'goal' of the rate case is to receive its revenue requirement increase, that 'there is a little bit of cushion built into what Spire asked for,' and that [Spire Missouri] never expected to actually receive that amount. Such a request is purely for the benefit of the shareholders.

•[A] number of these litigated issues were unique shareholder-focused ratemaking tools, such as the revenue stabilization mechanism, the requested high rate of return of 10.35 percent, three new tracking mechanisms to limit shareholder risk, and earnings-based incentive compensation which has been consistently denied by the Commission. It was Spire Missouri's decision and entirely within Spire Missouri's power to pursue these issues and to file this rate case and the shareholders stood to benefit from those issues. Also, [Spire Missouri's] witness admitted that the company 'padded' its revenue requirement beyond what it expected to receive by pursuing strong positions on issues it did not expect to win, which is clearly to the benefit of the shareholders over the ratepayers. Finally, rate case expense for this proceeding has far exceeded [Spire East's] and [Spire West's] estimates and their historical rate case expense levels.

•Staff and [the OPC] each argue that certain expenses of Spire Missouri in this matter were not prudent and should be born entirely by the shareholders. However, the Commission does not find that any specific individual items of rate case expense were imprudent. A rate case expense sharing mechanism will act as sufficient incentive for the company to manage its costs.

Based on analogous facts, the Western District rejected an analogous argument in ***KCP&L***,

509 S.W.3d at 778-79:

> We will not say the PSC did not have the authority to determine that expenses incurred by KCPL for the sole benefit of its shareholders were imprudent such that it would be unjust and unreasonable to require ratepayers to bear the burden of those expenses. Here, where the PSC has found a certain category of expenditures imprudent, it would not make sense to require the PSC to do a line

25

item review of the costs associated with the expenditure to determine whether each cost associated with KCPL's litigation strategy was imprudent. The majority of costs, for example, those related to infrastructure and transmission costs, are transparent and verifiable by the PSC. Rate case expenses are opaque, shielded from effective oversight by privilege and confidentiality. It would be an abdication of the PSC's responsibility to set just and reasonable rates to allow a utility to benefit from imprudently incurred litigation expenses. Serious doubt as to the prudency of KCPL's litigation strategy was raised by the parties, and it was KCPL's burden to prove that its expenses (i.e. the expenses related to the litigation strategy found by the PSC to have been solely for the benefit of shareholders) were just and reasonable. KCPL does not argue on appeal that its litigation strategy was prudent but only that the remedy crafted by the PSC was not within its power. We find that the remedy crafted by the PSC was a reasonable exercise of the PSC's discretion and expertise in determining just and reasonable expenses to be borne by ratepayers.

For the reasons well expressed in **KCP&L**, Spire Missouri's argument is unavailing.[30]  Spire Missouri fails to demonstrate that the PSC's decision was unlawful or arbitrary and capricious.

Point II is denied.

### Point III:  Spire Missouri's Pension Asset

In its third point, Spire Missouri argues that the PSC erred in its

Order eliminating $28.8 million of [Spire Missouri]'s pension asset, because such action and ruling, being subject to review under Sections 386.510 and 536.140.2 R.S.Mo., was arbitrary, unreasonable and unsupported by competent and substantial evidence on the whole record, in that it **directly conflicted with the clear evidence in the record demonstrating that a pension asset accrued as a result of the rates set in the company's 1990 and 1994 rate cases**.

(Emphasis added).

Spire Missouri's argument points to several previous rate cases decided by the PSC, asserts the PSC should have believed witnesses that it did not, directs that the PSC's failure to render a decision in accord with Spire Missouri's preferred interpretation of the evidence means that the

---

[30] At oral argument, Spire Missouri's counsel made numerous arguments that **KCP&L** did not abandon the "prudence standard," and premised many arguments on that basis—however, that argument is not decisive based on the matters presented, and we therefore need not (and do not) address it.

PSC "completely ducked this issue," and "led to a decision that is arbitrary, ***unsupported by competent and substantial evidence***, and ***contrary to the overwhelming weight of the evidence***."

As an initial matter, a substantial-evidence challenge and an against-the-weight-of-the-evidence challenge are distinct claims. "They must appear in separate points relied on in the appellant's brief to be preserved for appellate review." ***Ivie v. Smith***, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014). Here, the prohibited commingling occurs in the argument, compounding the seriousness of the violation.

Regardless, this manner of argument is doomed from inception. "We consider the evidence, along with all reasonable supporting inferences, in the light most favorable to the Commission's order. If the evidence supports two conflicting conclusions, we will defer to the Commission's factual findings." ***Matter of Water Rate Request of Hillcrest Util. Operating Co., Inc.***, 523 S.W.3d 14, 18–19 (Mo.App. W.D. 2017) (internal quotations and citations omitted). "[W]e will not weigh the evidence[,]"[31] which is exactly what Spire Missouri asks this Court do.

More substantive *ex gratia* treatment is ill-advised and unwarranted in this instance. Upon matters not briefed in accord with Rule 84.04 and our standard of review, and upon what the OPC describes as "an overwhelmingly technical question," a lengthy digression risks more harm than any countervailing benefit. Spire Missouri fails to demonstrate that the PSC abused its discretion in entering the "Order eliminating $28.8 million of [Spire Missouri]'s pension asset." Point III is denied. The Orders of the PSC are affirmed.

WILLIAM W. FRANCIS, JR., P.J. - OPINION AUTHOR

JEFFREY W. BATES, J. - CONCURS

MARY W. SHEFFIELD, J. - CONCURS

---

[31] ***Union Elec. Co. v. Pub. Serv. Comm'n of State of Missouri***, 136 S.W.3d 146, 151 (Mo.App. W.D. 2004).